43 A.3d 1174 (2012)
426 N.J. Super. 106
CORRECTIONAL MEDICAL SERVICES, INC., Plaintiff-Respondent,
v.
STATE of New Jersey, DEPARTMENT OF CORRECTIONS, State of New Jersey, Department of the Treasury, Division of Purchase and Property, Contract Compliance and Audit Unit, Defendants-Appellants, and
Alice Small, Acting Director, Division of Purchase and Property, in official capacity only, Defendant.
No. A-5334-10T4
Superior Court of New Jersey, Appellate Division.
Submitted January 18, 2012.
Decided May 22, 2012.
*1176 Jeffrey S. Chiesa, Attorney General, attorney for appellants (Beth Leigh Mitchell, *1177 Assistant Attorney General, of counsel; Cynthia Hackett, Deputy Attorney General, on the brief).
Ballard Spahr L.L.P., attorneys for respondent (Michael R. Carroll and Neal Walters, Cherry Hill, on the brief).
Before Judges PAYNE, REISNER and HAYDEN.
The opinion of the court was delivered by
PAYNE, P.J.A.D.
As the result of the grant by the New Jersey Supreme Court of the motion for leave to appeal filed by defendants State of New Jersey, Department of Corrections (DOC) and State of New Jersey, Department of the Treasury, Division of Purchase and Property (DPP), Contract Compliance and Audit Unit (CCAU) (collectively, State or defendants), and the Court's remand of the matter to us for consideration on the merits, we address defendants' appeal from a January 14, 2011 order by the trial court overruling defendants' assertion of the deliberative process and the official information privileges in connection with the production of certain documents in this contract litigation and the court's March 18, 2011 order denying reconsideration of its decision and requiring production of the disputed documents by April 18, 2011.[1]

I.
We recount the case's factual background and procedural history at some length to provide a context for our legal analysis of the issues raised. Commencing in 1995, plaintiff Correctional Medical Services (CMS), as a private contractor, provided medical and dental services to New Jersey's prison inmates under a series of contracts negotiated by the DPP and administered by the DOC. In 2004, CMS was awarded a further contract that ultimately ran from April 1, 2005 through September 30, 2008. That contract contained a series of "objective performance/critical indicators" by which CMS's performance would be gauged. It also contained a specified audit process that permitted the performance of quarterly audits of CMS's work at each institution, specified the level of monitoring that could be imposed, and established an administrative process by which results could be reviewed and contested by CMS until such time as a final decision was reached by the DOC. The contract also contained a liquidated damages provision that permitted the deduction of such damages from payments due CMS in the month following the expiration of the deadline for an appeal from a final administrative decision regarding the work.
However, on August 29, 2005, the Regional Vice-President of CMS, wrote to a DOC Assistant Commissioner memorializing his understanding that, in the preceding eight months, the DOC had agreed, among other things, to enforce the contract's liquidated damages clause only for CMS's "continued failure to progress in program improvement efforts." As a result of that agreement, no liquidated damages assessments were imposed in the early years of the contract.
In July 2005, the Contract Compliance and Audit Unit (CCAU) of the DPP commenced a performance audit of the dental portion of the CMS contract. In February 2006, it distributed a draft dental audit report to representatives of the DOC and CMS with a request for comments. A final report, timed to coincide with a report issued by the New Jersey Office of the Inspector General (OIG), was issued in October 2007 detailing the audit results pertaining to performance of dental services under the contract.[2]
*1178 At approximately the same time that the CCAU was conducting its audit, the OIG instituted an independent investigation of services provided by CMS. On October 15, 2007, it issued its first report detailing the results of its investigation into alleged contract noncompliance by CMS, particularly in connection with dental services. The report described the OIG's investigative process as follows:
In conducting the investigation, OIG interviewed 24 people, many of them multiple times, including DOC employees, CMS representatives, the president of the former dental services provider,[3] and representatives from Treasury's Division of Purchase & Property. OIG gathered over 12,000 pages of documents that were logged into a database. OIG also performed a site visit at the DOC Central Reception and Assignment Facility, including an observation of the dental intake process.
OIG provided a draft of this report to the Commissioner of the Department of Corrections for review and comment. The Commissioner's comments and the comments of responsible staff have been included in this report as appropriate.
The OIG observed that the DOC had failed to assess CMS's compliance with contract requirements for purposes of potentially levying liquidated damages, and that the DOC's stated reason for adopting that course was because CMS's services were improving. The OIG concluded in that regard that the Assistant Commissioner's agreement with CMS's Vice-President to refrain from assessing liquidated damages was completely unauthorized. The OIG recommended that the DOC review dental records for improper payments and, under the direction of the DPP, calculate the amount of liquidated damages to be assessed against CMS "for the entire period of the contract and assess liquidated damages."
Thereafter, in December 2008, the OIG issued a supplemental report concerning its investigation of CMS's performance of both dental and medical services. Again, it detailed its investigative process, which included interviews with eighteen people and the gathering of over 1,000 pages of documents, and its provision of a draft version of the report to the DOC and the Assistant Commissioner for comment.
In its supplemental report, the OIG concluded that CMS's performance did not meet levels required by the contract, the State should have been imposing liquidated damages, and that the failure to do so was the result of the unauthorized agreement between the Assistant Commissioner and CMS's Vice-President.
In the meantime, in December 2007, the CCAU began an expanded audit to determine liquidated damages through a review of all available objective performance indicator reports. In a letter dated July 31, 2008, the Acting Director of the DPP, defendant Alice K. Small, provided details with respect to the DPP's calculation of $3,405,979.10 in liquidated damages that the Division planned to withhold from payments due CMS. Following an exchange of correspondence, the assessment was adjusted downward to $3,244,024.13. Thereafter, various additions and adjustments were made, resulting in the imposition of a total of $3,608,981.06 in liquidated damages for the entirety of the contract.
The contract with CMS was not renewed, and commencing on October 1, 2008, inmate health services were provided by the University of Medicine and Dentistry of New Jersey.
On November 10, 2008, CMS filed a verified complaint styled as an action in *1179 lieu of prerogative writs and an order to show cause in the Law Division. Defendants moved to dismiss the action, and their motion was granted without prejudice by Judge Feinberg, who held that the complaint should have been brought under the Contractual Liability Act, N.J.S.A. 59:13-1 to 10. At oral argument on the motion, the following exchange occurred between Judge Feinberg and the attorney for the defendants:
THE COURT: Do you take the position that under the liquidated damage clause the State acted appropriately?
COUNSEL: Your Honor, there's no way I can take the position, because it clearlythey're right. It says DOC will do a number of things that DOC absolutely did not do. There are a few DOC audits from June 2008, and liquidated damages were assessed from those as well. So there is some action later in the contract period, but ... the State's argument is that ... under the contract... we still had authority to assess liquidated damages. That's what we've done.
On January 10, 2009, Judge Feinberg executed an order dismissing CMS's complaint without prejudice.
CMS appealed Judge Feinberg's order. While the appeal was pending, on April 8, 2009, it filed the present action for breach of contract, alleging, among other things, that the proposed assessment of liquidated damages was in violation of contractual procedures and the substantive terms of the contract; that the assessment was untimely and based on incomplete or inaccurate facts and improper methodologies; and that a waiver of the right to assess liquidated damages existed as the result of the State's repeated and ongoing approval of CMS's performance.
On April 8, 2010, we affirmed Judge Feinberg's order of dismissal of the first action in an unreported opinion. Corr. Med. Serv. v. State of N.J., Docket No. A-3820-08 (App. Div. April 8, 2010). In the course of the opinion, we considered CMS's argument that Judge Feinberg erred in considering the OIG reports in rendering her decision. Id. (slip. op. at 8). We found her consideration of those documents proper as indicia that the State had some facially reasonable basis for withholding payments from CMS pending adjudication of the claims for liquidated damages. Ibid. However, we observed: "The accuracy and validity of the OIG reports, as well as audits performed by the Division of Purchase and Property, will no doubt be explored at the trial of the [Contractual Liability Act] claims currently pending before the Law Division." Id. at 9.
In connection with discovery requests made in the present breach of contract action, the State claims that it reviewed approximately 47,000 pages of documents, disclosing a significant number of them to CMS. However it withheld or redacted approximately 7,000 documents, relying on the deliberative process and/or official information privileges in doing so. According to the State, the withheld documents fell into seven categories:
(1) communications (e-mails, letters and memoranda) among employees of DPP;
(2) communications (e-mails, letters and memoranda) among employees of DOC;
(3) communications (e-mails, letters and memoranda) between employees of DOC and DPP;
(4) communications (e-mails, letters and memoranda) between the OIG and DPP and DOC relating to the OIG's investigation of CMS;
(5) documents from the files of DOC and DPP containing handwritten notes indicating personal opinions and thoughts of the author;

*1180 (6) files relating to the initial dental audit conducted by CCAU, including drafts of the audit report provided to DOC for its review and comment, along with the responses of DOC to the various drafts of the audit report; and
(7) preliminary drafts of various agency documents, including preliminary liquidated damages calculations, audit reports and correspondence.
On March 16, 2010, CMS moved to compel the State to produce the withheld and redacted documents in their entirety, arguing that because the State's decision-making process was the central issue in the case, it could not take refuge in the deliberative process privilege. CMS consented to production under a protective order that would shield the documents from public scrutiny. In June, the court directed the State to produce to it unredacted copies of the documents for in camera review, as well as its privilege log.
On January 7, 2011, the court issued a written decision in the matter. In it, the court held that the deliberative process privilege protected the formulation of government policy. It continued:
The instant case, however, does not involve the formulation of government policy. Rather this litigation is a straightforward breach of contract claim which happens to involve a governmental entity.
The issue in the case is simply whether the State acted properly in assessing liquidated damages against the plaintiff. The agreement required the State to monitor the contractor's performance in supplying medical services using the [objective performance indicators] developed by the State. The State made decisions concerning the plaintiff's performance on the standards. The State then determined whether liquidated damages were justified and, if so, the amount of the damages to be assessed. The communications between those agents and employees of the State involved on the issue of the plaintiff's alleged breach of the contract and the assessment of liquidated damages do not go to any generalized governmental policy, but relate directly to the relationship [of] the parties to the contract.
Defendants moved for reconsideration, and a hearing on their motion took place at which time the State argued that the court had construed precedent too narrowly, and that, when properly interpreted, precedent established that the deliberative process privilege applied more generally to the governmental decisionmaking process involved in this case. The State also claimed that the court had failed to address, in its initial opinion, the State's argument that documents generated by the OIG were protected by the official information privilege. Addressing the latter point, CMS argued that the State had admitted to its failure to follow the steps required by the contract prior to an assessment of liquidated damages, but asserted an affirmative defense that it was excused from doing so because of the conduct revealed by the OIG investigation. Accordingly, CMS was entitled to full discovery regarding that defense, as well as discovery regarding the contractual issues it had raised.
Following argument, the court adhered to its initial decision with respect to the deliberative process privilege stating that the privilege "doesn't apply to a situation such as this where the very underlying cause of action is discussed in the various documents generated by the State." With respect to the official information privilege, the court noted that N.J.R.E. 511 precluded disclosure of official information of the State "if the judge finds that the disclosure of the information in the action would be harmful to the interest of the public." The *1181 court then held: "There's no general public interest need with regard to the documents sought by CMS here. At least none has been raised in specifics."
An order denying reconsideration was entered on March 18, 2011, and on April 29, 2011 the court entered a stay of its discovery order. This interlocutory appeal followed.

II.
We start our analysis with a well-recognized principle.
Generally, pursuant to Rule 4:10-2(a), parties may obtain discovery regarding any non-privileged matter that is relevant to the subject of a pending action or is reasonably calculated to lead to the discovery of admissible evidence. Our discovery rules are to be liberally construed because we adhere to the belief that justice is more likely to be achieved when there has been full disclosure and all parties are conversant with all available facts. Payton v. New Jersey Turnpike Auth., 148 N.J. 524, 535 [691 A.2d 321] (1997) (citing Catalpa Inv. Group, Inc. v. Franklin Tp. Zoning Bd. of Adjustment, 254 N.J.Super. 270, 273 [603 A.2d 178] (Law Div.1991)).
[In re Liquidation of Integrity Ins. Co., 165 N.J. 75, 82, 754 A.2d 1177 (2000).]
It has long been held in New Jersey that pretrial discovery should be accorded the broadest possible latitude. See Jenkins v. Rainner, 69 N.J. 50, 56, 350 A.2d 473 (1976). In general, a litigant is entitled to any information that might lead to the discovery of relevant evidence. Integrity, supra, 165 N.J. at 82, 754 A.2d 1177; see also N.J.R.E. 401 (defining relevant evidence).
Nonetheless, certain privileges have been recognized that permit the nondisclosure of relevant materials, including the deliberative process privilege, which was first specifically recognized in New Jersey in Integrity. Id. at 83-88, 754 A.2d 1177. To establish the applicability of that privilege, the state agency invoking it has the initial burden of showing that the documents that it seeks to protect are "pre-decisional[4] and deliberative in nature (containing opinions, recommendations, or advice about agency policies)." Id. at 88, 754 A.2d 1177. The purpose of the privilege is to permit open and frank discussions of administrative action before policy is set. Id. at 84, 754 A.2d 1177. Once the documents reflecting such discussions are demonstrated to be deliberative, a presumption against disclosure arises. The burden then falls upon the party seeking disclosure to show a substantial need for the materials that overcomes the government's interest in non-disclosure. Id. at 88, 754 A.2d 1177. Factors to be considered in determining whether disclosure should occur include the importance of the evidence to the moving party, the government's role in the litigation, and the extent to which disclosure would hinder frank and independent discussion regarding proposed policies and decisions. Id. at 85-86, 754 A.2d 1177. "Like all evidentiary privileges that derogate a court's inherent power to compel the production of relevant evidence, the deliberative process privilege is narrowly construed." Greenpeace v. Nat'l Marine Fisheries Serv., 198 F.R.D. 540, 543 (W.D.Wash.2000) (citations omitted).
In this matter, defendants have invoked the deliberative process privilege in a single-count suit by CMS alleging breach of contract by defendants. As such, this case bears little resemblance to the two decisions of the New Jersey Supreme Court in which the deliberative process privilege has been specifically discussed at length, neither of which involved claims *1182 of a breach of contract aimed directly at the party seeking to withhold documents on grounds of privilege. See Integrity, supra, and Education Law Ctr. v. N.J. Dept. of Educ., 198 N.J. 274, 966 A.2d 1054 (2009).
In Integrity, entities providing reinsurance to Integrity Insurance Company prior to its insolvency challenged a Final Dividend Plan, proposed by the Commissioner of Insurance, to permit the early termination of the liquidation by estimating contingent claims, reducing them to present value, collecting that value from the reinsurers, and utilizing the reinsurance proceeds as a part of a final dividend payment on policyholder claims. 165 N.J. at 80, 754 A.2d 1177. During discovery, the Commissioner declined to produce certain documents relevant to the reinsurers' challenge to the Plan that pertained to its fairness and feasibility,[5] citing the deliberative process privilege, among others. Id. at 83, 754 A.2d 1177. While recognizing the existence of the privilege and discussing its parameters in general terms, the Court determined that, because of the hybrid public/private nature of the Commissioner's role as liquidator, "the invocation of the deliberative process privilege should [not] be countenanced in this context." Id. at 91, 754 A.2d 1177.
The issues in Education Law Center, supra, 198 N.J. 274, 966 A.2d 1054, likewise, have little direct relationship to those in the present case. In that case, the Education Law Center (ELC), as representative of pupils in the State's poorest school districts, challenged in litigation with the Department of Education (DOE) its revised state funding formula for public education. Id. at 279, 966 A.2d 1054. In that connection, ELC filed a document request, pursuant to the Open Public Records Act (OPRA), N.J.S.A. 47:1A-1 to -13, seeking records "related to the ... estimate, review and/or analyses of the cost of providing a thorough and efficient education undertaken by the Office of School Funding." Id. at 281, 966 A.2d 1054. Although many documents were produced in response to the request, the DOE sought to withhold, on the basis of OPRA's deliberative process exemption and under a balancing of interests based on common law right of access principles, a single memorandum prepared by it that outlined state aid simulation results for three school funding formula structures. Id. at 279-80, 966 A.2d 1054. Its refusal to produce the document raised the issue, novel in New Jersey, of "how to determine precisely when material is `deliberative,' in those instances involving statistical and like data that have factual components, but may project opinions or expose an agency's deliberations or reasoning process." Id. at 288, 966 A.2d 1054.
In determining whether the document at issue was "deliberative," the Court declined to adopt a "fact" versus "opinion" dichotomy, stating that "a court must recognize the difference between factual material that is part of the formulation, or exercise, of policy-oriented judgment from factual material that is not." Id. at 294-95, 966 A.2d 1054. Adopting the rationale of the D.C. Circuit in Mapother v. Dep't of Justice, 3 F.3d 1533, 1539 (D.C.Cir.1993), the Court held: "Because of `the need for deliberation to inform discretion and for confidentiality to protect deliberation,' ... we are convinced that the key to identifying deliberative material must be how closely the material (including the selection of `factual' or `informational' material) relates to the `formulation or exercise of ... policy-oriented judgment or [to] the process *1183 by which policy is formulated.'" Education Law Center, supra, 198 N.J. 274, 966 A.2d 1054. The Court stated:
[T]he question of what is protected under the deliberative process privilege, incorporated into OPRA as an exemption from the definition of a "government document," must depend, first, on whether the information sought is a part of the process leading to formulation of an agency's decision, (not on a simplistic label of "fact" or "opinion,"), and, second, on the material's ability to reflect or to expose the deliberative aspects of that process.
[Ibid.]
In adopting that standard, the Court recognized "the importance of promoting government's full and frank discussion of ideas when developing new policies, or in examining existing policies and procedures" and it further recognized that "such activities constitute a process of policy examination and evaluation." Ibid.
Accordingly, the Court held: "[A] record, which contains or involves factual components, is entitled to deliberative-process protection when it was used in the decision-making process and its disclosure would reveal deliberations that occurred during that process." Id. at 280, 966 A.2d 1054. Examining the memorandum at issue, the Court observed that data set forth in it was "manipulated to provide organized information useful to the DOE, specifically for the purpose of aiding the agency in deciding on an aspect of a new funding scheme" and it was created as part of the deliberative process and was reflective of the DOE's deliberations. Id. at 301, 966 A.2d 1054. The Court thus found the memorandum to be protected. Id. at 301-02, 966 A.2d 1054.
The Supreme Court was not called upon either in Integrity or in Education Law Center, to consider the issue raised in the present appeal of the applicability of the deliberative process privilege to governmental documents relevant to a breach of contract action in which those documents are material to the litigation. Our Appellate Division opinions, similarly, offer little assistance in that respect since they primarily concern the applicability of the privilege to OPRA requests conducted for investigative purposes. See Fisher v. Division of Law, 400 N.J.Super. 61, 74-75, 946 A.2d 53 (App.Div.2008) (affirming utilization of deliberative process privilege to shield certain information from disclosure pursuant to an OPRA request by a journalist for records relating to the calculation of a special service charge for production of records identified in a prior OPRA request); Gannett N.J. Partners, LP v. Cnty. of Middlesex, 379 N.J.Super. 205, 219-20, 877 A.2d 330 (App.Div.2005) (following reporter's OPRA request, applying privilege to deliberative portion of handwritten notes of principal planner regarding her tentative views as to the County's course of action in connection with an acquisition of a particular farm that was subject to federal governmental scrutiny); In re Readoption with Amendments of Death Penalty Regulations, 367 N.J.Super. 61, 73-75, 842 A.2d 207 (App.Div.) (in challenge to regulations governing death by lethal injection, considering applicability of privilege pursuant to OPRA and common law, to certain documents withheld by the DOC), certif. denied, 182 N.J. 149, 862 A.2d 57 (2004); see also Paff v. Dir., Office of Attorney Ethics, 399 N.J.Super. 632, 646-48, 945 A.2d 149 (Law Div.2007) (determining that reports and analyses created by the Office of Attorney Ethics in connection with its investigation of an attorney who consented to disbarment were protected from disclosure to a third party by the deliberative process privilege).
More recently, in McGee v. Township of East Amwell, 416 N.J.Super. 602, 620-21, 7 A.3d 785 (App.Div.2010), we found use of *1184 OPRA's deliberative process privilege properly sustained by the Government Records Council as applicable to communications between present members and a former member of the municipality's Planning Board regarding a Planning Board meeting at which a response to a suit of an unspecified nature by the requestor would be discussed. See also Tractenberg v. Twp. of W. Orange, 416 N.J.Super. 354, 366-73, 4 A.3d 585 (App.Div.2010) (holding that property appraisals of open land performed by a private appraiser for the township council with a view toward preservation as open space were subject to disclosure pursuant to OPRA and were not protected by the deliberative process privilege, because they merely contained raw data and did not have the capacity to expose the Township's deliberative process).
Indeed, the only case that either party has cited that discusses the invocation of the deliberative process privilege in the context of contract litigation is Kaiser Aluminum & Chemical Corporation v. The United States, 141 Ct.Cl. 38, 157 F.Supp. 939 (1958), cited favorably by the Integrity Court. Integrity, supra, 165 N.J. at 83-84, 754 A.2d 1177. In that case, plaintiff Kaiser filed suit alleging a breach of a most favored purchaser clause of a contract between Kaiser and the government occurring when the Liquidator of War Assets, the General Services Administration (GSA), sold fabricated aluminum products plants of the same type covered by Kaiser's contract to Reynolds Aluminum Company.
In connection with its suit, Kaiser sought
all internal GSA reports, memoranda, or other documents concerning ... sales to Kaiser and Reynolds prepared by all employees or agents of the Administration for intra-agency use, particularly prior drafts of the Kaiser contract with Agency interpretation and justification thereof and similar papers in connection with that claim. There was also sought the like intra-agency reports and comparisons concerning the Reynolds contract.
[Id. at 42, 157 F.Supp. 939.]
Significantly, the government complied with that demand, asserting the deliberative process privilege in connection with only one document, a memorandum by a Special Assistant to the War Assets Liquidator providing recommendations and advice on program policy. According to the court, "[h]e played no part in the operative events involved in this case and had no relations or discussions with plaintiff or its competitor. His use by the Liquidator on the matters here in question was in the nature of a confidential assistant." Id. at 44, 157 F.Supp. 939. When viewed in that light, the court concluded that the document providing advice on contract formation was qualifiedly privileged and that the privilege had not been overcome by Kaiser. Id. at 47-49, 157 F.Supp. 939. Importantly, no issue was raised with respect to the discovery addressing the circumstances of the contractual breach, and all requested discovery was provided to Kaiser.
The Kaiser opinion suggests to us a profound distinction between the governmental activities underlying the contractual litigation occurring in this case and the governmental analysis leading to the formulation of policy positions and other decisions of comparable weight that the Kaiser court was asked to protect. Although both involve decisionmaking, we find it reasonable to conclude, as has the D.C. Circuit, that "[t]he deliberative process privilege ... is centrally concerned with protecting the process by which policy is formulated." Petroleum Info. Corp. v. U.S. Dep't of Interior, 976 F.2d 1429, *1185 1435 (D.C.Cir.1992); see also Envtl. Prot. Agency v. Mink, 410 U.S. 73, 87, 93 S.Ct. 827, 837, 35 L.Ed.2d 119, 132 (1973) (stating that it would be "impossible to have any frank discussion of legal or policy matters in writing if all such writings were to be subjected to public scrutiny") (emphasis supplied); Playboy Enters. v. Dep't of Justice, 677 F.2d 931, 935 (D.C.Cir.1982) (holding that factual material in report was not within privilege because compilers' mission was simply "to investigate the facts," and because report was not "intertwined with the policy-making process"); Coastal States Gas Corp. v. Dep't of Energy, 617 F.2d 854, 869 (D.C.Cir.1980) (resting conclusion that documents were not within the deliberative process exemption for discovery on ground that the documents did not "discuss the wisdom or merits of a particular agency policy or recommend new agency policy"). "[W]hen materials [can] not reasonably be said to reveal an agency's or official's mode of formulating or exercising policy-implicating judgment the deliberative process privilege is inapplicable." Petroleum Info. Corp., supra, 976 F.2d at 1435 (emphasis supplied; citations omitted).
Although the State has the burden of establishing its privilege claim, it has not provided us with copies of the allegedly privileged documents under seal or otherwise. However, it is clear from the State's general description that the documents at issue reflect the internal discussions within and between various agencies responsible for auditing and administering the State's contract with CMS that led to the assessment of liquidated damages that CMS now contests. Although they may reflect agency decisionmaking processes regarding the administration of the CMS contract, we are satisfied that such processes are not the sort of actual policymaking that the deliberative process privilege was designed to protect. In this regard, the Texas Supreme Court has observed:
To hold ... that documents are exempt from public access because they somehow involve policy, is the same as holding that there is no policy requirement at all. This is because every decision an agency makes arguably involves a policy. Thus, every document reflecting predecisional and deliberative communications, regardless of its policy implications, would be exempt from public access.... Instead, we hold that the deliberative process privilege as incorporated in the agency memoranda exception protects only those documents involved in policy formulation.

[City of Garland v. Dallas Morning News, 22 S.W.3d 351, 365 (Tex.2000).]
The State argues that the dispute with CMS implicates more than a simple contract, and that it involves "inadequate inmate health care" which is "a matter of constitutional dimension." We reject defendants' position. CMS did not seek documents related to New Jersey's decision to privatize prison healthcare or the process by which the State selects private firms or other entities to provide medical services to inmates. Nor did CMS demand material related to the State's policy on how it generally applies liquidated damages provisions to enforce performance by its contractors.
What CMS seeks are communications that reveal the circumstances surrounding the State's investigation of its conduct, the State's determination to enforce its right to liquidated damages and its calculation of those damages. The background history leading up to the State's determination is directly relevant to understanding whether the State's action was justified in light of CMS's claim that it had an agreement with the DOC, memorialized in August 2005, that liquidated damages would be assessed only if its performance fell significantly below the standards set by the contract *1186 and to its challenge to the computation of liquidated damages.
Moreover, in the present case, defendants argue that the disclosure of the withheld documents would reveal candid communications among agency personnel related to the decision-making process, but defendants do not define the decision-making process that they seek to protect. The following justification asserted by defendants for nondisclosure is typical:
A. Categories 1 & 5: Communications Among Employees of DPP, and Their Handwritten Notes Indicating Personal Opinions.
These communications include emails and memoranda, between and among employees of the Treasury, primarily DPP staff (including CCAU), and include Assistant Directors of DPP, auditors, and Director's chief of staff, and higher officials in the Treasurer's Office. The documents contain exchanges of ideas, suggestions and opinions regarding the dental audit and the later assessment, calculation and collection of liquidated damages in the medical categories.
If DPP staff were discouraged from contributing their ideas and suggestions to their superiors by the threat of public scrutiny, the Director's ability to develop informed policies and decisions would be hampered. This ability is especially important in this instance, where CCAU is responsible for ensuring that State contractors comply with their contractual obligations. N.J.A.C. 17:12-1.3. Application of the balancing test would have considered that DPP must be free to carry out this function effectively, especially with contracts of the magnitude of CMS's inmate medical and dental contract.
"Conclusory assertions of privilege will not suffice to carry" the defendant's burden of establishing the right to withhold disclosure. Coastal States Gas Corp., supra, 617 F.2d at 861; Timken Roller Bearing Co. v. U.S., 38 F.R.D. 57, 63 (N.D.Ohio 1964) (a "naked assertion" of privilege by the executive is insufficient to assure nondisclosure); Tractenberg, supra, 416 N.J.Super. at 367, 4 A.3d 585 (placing burden to establish privilege on the government). Here, it is not possible to determine with any accuracy, what "decision" is the focus of defendants' concern, since no substantive articulation has been presented.[6] Indeed, it can certainly be argued that the only "decision" in this case occurred in 2004 when the State determined to enter into a further contract with CMS and adopted the contract terms at issue. Thereafter, the State merely effectuated the contract's terms. If viewed in this fashion, all "decisions" at issue were post- not pre-decisional.
Further, it is difficult to cast any "decisions" following contract formation as fitting into the deliberative mold. As courts have held, an understanding of the function of the documents at issue in the administrative process that generated them is crucial to a determination as to whether they should be deemed privileged. Nat'l Labor Relations Bd. v. Sears, Roebuck & Co., 421 U.S. 132, 138, 95 S.Ct. 1504, 1511, 44 L.Ed.2d 29, 40 (1975); Education Law Ctr., supra, 198 N.J. at 281, 966 A.2d 1054. Examining the circumstances of this case, we conclude that, effectively, what occurred was that the OIG, *1187 having determined that the DOC had failed to follow contractually specified audit procedures, directed the DOC, with the assistance of the DPP and the CCAU, to enforce the terms of the contract with CMS. While the OIG's determination that the contract should be enforced and that the DOC was derelict in failing to do so certainly constituted a "decision," the determination to require the fulfillment of contractually specified audit procedures and to mandate the imposition of contractually authorized penalties is hardly the type of decision that courts have deemed to be protected by the deliberative privilege. The resulting contract compliance efforts by the DOC, the DPP and the CCAU, while requiring various decisions in order to effect their goal, were essentially ministerial in nature, and not of a sort warranting protection from disclosure. As defendants admit in their reply brief, "DOC did not have the authority to amend the liquidated damages provisions in the contract." Thus, the DOC's enforcement was not a matter of discretion or recent policy formulation.
"[T]he purpose of the deliberative process privilege `is to enhance "the quality of agency decisions," by protecting open and frank discussion among those who make them within the Government,' [Dep't of Interior v.] Klamath [Users Protective Ass'n], 532 U.S. [1] 8-9 [121 S.Ct. 1060, 1066, 149 L.Ed.2d 87, 95-96 (2001)] (quoting Sears, Roebuck, [supra] 421 U.S. at 151 [95 S.Ct. at 1517, 44 L.Ed.2d at 47]), not to further the litigation strategy of counsel." PG & E v. U.S., 70 Fed.Cl. 128, 144 (Ct. Claims 2006); see also Klamath, supra, 532 U.S. at 9, 121 S.Ct. at 1066, 149 L.Ed.2d at 96 (the "point is not to protect Government secrecy pure and simple"). Because the State has not met its burden of establishing the applicability of the deliberative process privilege to the decisions made by defendants in this case, we affirm the order of the trial court finding the deliberative process privilege inapplicable to the documents that defendants seek to withhold.
Similarly, we find that the factual materials contained in the documents sought to be protected by the deliberative process privilege are discoverable. While the Court has held that "a record, which contains or involves factual components, is entitled to deliberative-process protection when it was used in the decision-making process and its disclosure would reveal deliberations that occurred during that process[,]" Education Law Center, supra, 198 N.J. at 280, 966 A.2d 1054, absent evidence that a process we would deem deliberative occurred or an identification of the decision to which the factual matters pertain, defendants have failed to meet their burden of proving that disclosure of the documents should be withheld.

III.
In withholding certain documents, defendants have also relied on the "official information" privilege set forth in N.J.R.E. 515, which provides:
No person shall disclose official information of this State or of the United States (a) if disclosure is forbidden by or pursuant to any Act of Congress or of this State, or (b) if the judge finds that disclosure of the information in the action will be harmful to the interests of the public.
The Rule does not define "official information." However, as noted by the Court in Integrity, supra, 165 N.J. at 93, 754 A.2d 1177, a prior version of N.J.R.E. 515 defined the term to include "information not open or theretofore officially disclosed to the public relating to internal affairs of the State ... in the course of duty, or transmitted from one such official to another in the course of his duty." (Citing *1188 Richard J. Biunno, N.J. Rules of Evidence, cmt. 1 on N.J.R.E. 515 (1999)).
The Court continued:
"Dean Wigmore has noted that some official information privilege undoubtedly exists, but adds that the scope of that privilege has not yet been defined with certainty."
[Ibid. (quoting Biunno, supra, N.J. Rules of Evidence, cmt. 1 on N.J.R.E. 515) (citing 8 Wigmore on Evidence § 2387 at 792 (McNaughton rev. 1961)).]
As examples of official information, the Court has noted the precise location of the site where a wiretap interception was made and the exact location from which a surveillance was conducted. Ibid. According to the Court, "[t]he basic difference between N.J.R.E. 515 and the deliberative process privilege is that the former protects facts from disclosure whereas the latter protects opinions." Ibid.
In this case, defendants seek to protect material compiled by the OIG for use in preparation of its final audit report. This material does not implicate section (a) of the Rule. Therefore defendants must prove that disclosure of this information will be harmful to the interests of the public.
In attempting to meet that burden, defendant argue that the OIG's purpose is to promote "integrity in the administration and operations of government" and to "improv[e] public accountability" and to do so it must work in secret. However, defendants have failed to demonstrate how the OIG's endeavors are furthered in this case by placing a mask of secrecy over what the OIG has already done. Indeed, without specific evidence to the contrary, we would anticipate transparency to constitute the OIG's goal in this matter. Defendants also suggest that because the OIG undertakes investigations, its preparatory material should be presumptively privileged. However, if the Legislature found it important to exempt such material from public disclosure, it could have statutorily required such a result as it did in connection with investigations conducted by the State Commission of Investigation. See N.J.S.A. 52:9M-15a. It has not done so, signaling an important distinction between the kind of investigations conducted by the Commission of Investigation and the OIG.
Defendants have thus failed to meet their burden of demonstrating a specific public harm that will result from the disclosure of the OIG material, and accordingly, it was properly ordered to be produced. Given our resolution of this issue, we decline to address whether the Attorney General has the requisite standing to raise a discovery privilege on behalf of the OIGan issue that was raised but not resolved by the trial court.
Affirmed.
NOTES
[1] The order for production has been stayed.
[2] That CCAU report does not appear in the record on appeal.
[3] Services were subcontracted.
[4] That is, created prior to a clearly-defined decision or policy.
[5] We note that the Plan was clearly a policy document, and the meetings leading to the formulation of the Plan were pre-decisional. See In re Liquidation of Integrity Ins. Co., 193 N.J. 86, 89-90, 935 A.2d 1184 (2007).
[6] An examination of defendants' privilege log reveals only the document's issue date, its author, its intended recipient, a brief reference to its subject matter, such as "Response to CDA letter" or "Email: DMS LD w/attachments," and a denomination of the privilege being invoked. Thus, the information provided is insufficient to establish why confidentiality is necessary. Coastal States Gas Corp., supra, 617 F.2d at 861.