57 A.3d 40

FRANK R. CIESLA O/B/O THE VALLEY HOSPITAL, APPELLANT, v. NEW JERSEY DEPARTMENT OF HEALTH AND SENIOR SERVICES,[1] DIVISION OF HEALTH CARE AND QUALITY OVERSIGHT, RESPONDENT, AND HACKENSACK UNIVERSITY MEDICAL CENTER, INTERVENOR–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued September 24, 2012—Decided December 4, 2012.

---

[1] Pursuant to *L.* 2012, *c.* 17, the name of the former Department of Health and Senior Services has been changed to the Department of Health. This opinion shall use the Department's current name even though the relevant events occurred before the statutory change.

130

Before Judges SABATINO, FASCIALE and MAVEN.

*Douglas S. Eakeley* argued the cause for appellant (*Lowenstein Sandler, PC* and *Giordano, Halleran & Ciesla, P.C.*, attorneys; *Mr. Eakeley* and *Frank R. Ciesla*, of counsel and on the brief).

*Michael J. Kennedy*, Deputy Attorney General, argued the cause for respondent Department of Health and Senior Services (*Jeffrey S. Chiesa*, Attorney General, attorney; *Lewis A. Scheindlin*, Assistant Attorney General, of counsel; *Mr. Kennedy*, on the brief).

*Jennifer Borek* argued the cause for respondent State of New Jersey Government Records Council (*Genova, Burns & Giantomasi*, attorneys; *Ms. Borek*, of counsel and on the brief; *Eileen Fitzgerald Addison*, on the brief).

*Thomas A. Abbate* argued the cause for respondent Hackensack University Medical Center (*DeCotiis, FitzPatrick & Cole, LLP*, attorneys; *Mr. Abbate, Gregory J. Bevelock* and *Mark A. Bunbury, Jr.*, on the brief)

The opinion of the court was delivered by

SABATINO, J.A.D.

We consider in this appeal a denial by the Government Records Council ("the GRC" or "the Council") of a request made under the Open Public Records Act ("OPRA"), *N.J.S.A.* 47:1A–1 to –13, to obtain a draft report prepared by staff within the New Jersey Department of Health ("the Department") concerning a hospital's application for a certificate of need.

For the reasons that follow, we affirm the GRC's ruling because the draft report is fully protected from disclosure under OPRA as "deliberative material" excluded from the statute's definition of a potentially obtainable "government record." We further hold that, as the GRC itself maintains, its statutory authority is confined to the resolution of OPRA-based requests, and therefore the GRC lacks jurisdiction to resolve common-law claims for records access. Applying our original jurisdiction over the common-law claims presented here, we conclude that appellant's interest in obtaining the draft report does not sufficiently outweigh the strong public policy that promotes robust and confidential internal advice to a governmental decision-maker. Consequently, the draft report is insulated from compelled disclosure under both OPRA and the common law.

## I.

This dispute over access to a draft governmental report grows out of a regulatory matter involving efforts by Hackensack University Medical Center ("HUMC") to re-establish a hospital in Westwood at the former site of Pascack Valley Hospital ("PVH"). Owing to severe financial problems, PVH plunged into bankruptcy and closed its doors in November 2007. In authorizing PVH's closure, the Commissioner of the Department stipulated that PVH's owners would be allowed to retain its license through December 2009. During that interval a purchaser of PVH's assets could seek the Department's approval to reopen the hospital. This would require the issuance of a certificate of need ("CN"), pursuant to *N.J.S.A.* 26:2H–7.

HUMC and a business partner acquired the assets of PVH at an auction in early 2008. Thereafter, in July 2008, HUMC filed a CN application with the Department, seeking a transfer of PVH's license and permission to reopen the hospital. In May 2009, the Department deemed the CN application complete, and submitted the matter to the State Health Planning Board ("SHPB") for its consideration. The SHPB scheduled a public hearing on the CN

application for July 23, 2009. In the meantime, staff at the Department analyzed the application and internally developed a recommendation on whether it should be approved. However, on July 7, 2009, HUMC asked to defer the hearing on its application, a request which the SHPB granted.[2]

Ultimately, HUMC withdrew the license transfer application and instead pursued an alternative plan to create a smaller community hospital at PVH's former site. To carry out that plan, HUMC filed an application with the Department in June 2011 to obtain a new CN for the proposed scaled-back facility. The application was opposed by two competing Bergen County hospitals: The Valley Hospital, Inc. ("Valley") of Ridgewood, and Englewood Hospital and Medical Center ("Englewood"). The Department's new Commissioner approved the CN application in February 2012.[3]

In the midst of these events, in January 2010, appellant Frank R. Ciesla, an attorney for Valley, submitted a request to the Department seeking a copy of the 2009 staff report concerning HUMC's 2008 CN application. The records custodian for the Department advised Ciesla that no document satisfied his request since the report had never been distributed to the SHPB.

Ciesla subsequently clarified that he understood that the report had not been distributed, but nevertheless wanted a copy. The custodian responded to Ciesla that the report existed only in draft form and was not subject to public disclosure, since it was "advisory, consultative or deliberative material."

[2] Appellant has presented in his appendix several news reports speculating that the Department's staff favored the denial of the application, intimating that this circumstance prompted HUMC to defer its application until after the November 2009 statewide election.

[3] The February 2012 CN approval is the subject of an unpublished opinion in companion appeals by Valley and Englewood, A–3155–11 and A–3238–11, *In re Certificate of Need for HUMC North Hospital,* also decided today.

Still desirous of obtaining the report, Ciesla filed a denial of access complaint with the GRC in February 2010, invoking both OPRA and the common law. The Department opposed the complaint. In its opposition, the Department submitted a supporting certification from John A. Calabria, Director of the Certificate of Need and Healthcare Facilities Licensing program. Calabria explained that the analysis and recommendations that his staff prepared within the Department were not final and could be revised at any time prior to their transmittal to the SHPB. He noted that it was "not uncommon for the staff recommendations to undergo multiple revisions during the internal staff review process[.]" Calabria further indicated that the staff recommendations for HUMC's 2008 CN application were never finalized because the application was deferred.

After reviewing the parties' submissions,[4] the GRC's executive director recommended that Ciesla's complaint be denied. On May 24, 2011, the GRC voted unanimously to adopt the executive director's findings and her recommendation. The GRC issued a corresponding final agency decision on June 2, 2011.

Ciesla appealed the GRC's denial of access to the draft report. Counsel for the GRC and the Department each filed briefs with this court opposing the appeal. In addition, HUMC intervened in the matter, likewise opposing Ciesla's demands for access. Meanwhile, the related consolidated appeals (A–3155–11 and A–3238–11) were respectively filed by Englewood and Valley contesting the merits of the CN issuance.

Englewood moved to settle the record in the merits appeals to include the unreleased 2009 draft report. In May 2012, a panel of this court denied that motion without prejudice to its renewal following briefing in the Ciesla appeal. At the same time, we directed that Ciesla's appeal be calendared back-to-back with the consolidated merits appeals. We also temporarily remanded the

---

[4] We note that the GRC did not review the draft report in camera, but instead relied upon the descriptions of that report furnished by the parties. Appellant does not argue that the GRC was obligated to review the draft.

Ciesla appeal to the GRC for reconsideration, in light of a recently published opinion addressing the deliberative process privilege, *Correctional Medical Services, Inc. v. State*, 426 *N.J.Super.* 106, 43 *A.*3d 1174 (App.Div.2012). As part of the remand, the Department furnished the GRC with a supplemental certification [5] from Calabria in which he amplified the factual grounds for treating the draft report as deliberative material.

On June 26, 2012, the GRC issued a remand decision reaffirming its prior ruling to deny Ciesla access to the draft report. In the course of its remand decision, the GRC distinguished our recent opinion in *Correctional Medical Services*, which had found that certain Department of Corrections documents did not comprise protected deliberative material. *Id.* at 123, 43 *A.*3d 1174. In particular, the GRC noted that the documents in *Correctional Medical Services* had been sought in civil discovery and not pursuant to an OPRA request. The GRC also noted that the documents in that other case were not generated in connection with an agency policy decision but rather concerned actions by the agency in terminating a private contractor, which had prompted that contractor to file a lawsuit for breach of contract.

On appeal, Ciesla argues that the GRC's denial of access to the draft report, pursuant to the deliberative process privilege, was arbitrary and capricious. Alternatively, he maintains that the GRC's decision should be reversed because he and his client, Valley, have a right to obtain the draft report based upon a common-law right of access. For the reasons that follow, we disagree.

## II.

### A.

We acknowledge that the general purpose of OPRA is to "maximize public knowledge about public affairs in order to ensure

---

[5] The supplemental certification had been previously filed with this court in opposition to *Englewood's motion to settle the record.*

an informed citizenry and to minimize the evils inherent in a secluded process." *Mason v. City of Hoboken,* 196 *N.J.* 51, 64, 951 *A.*2d 1017 (2008) (quoting *Asbury Park Press v. Ocean Cnty. Prosecutor's Office,* 374 *N.J.Super.* 312, 329, 864 *A.*2d 446 (Law Div.2004)). Accordingly, OPRA provides that "government records shall be readily accessible for inspection, copying, or examination by the citizens of this State, *with certain exceptions,* for the protection of the public interest[.]" *N.J.S.A.* 47:1A–1 (emphasis added). The present appeal turns upon one of those codified exceptions.

A person who is denied access to a government record may challenge the custodian's decision by filing an action in the Superior Court or by filing a complaint with the GRC. *N.J.S.A.* 47:1A–6. The public agency bears the burden of proving that the denial of access was authorized by law. *Ibid.*

Although OPRA rather broadly defines what is a "government record," it expressly provides that the term "shall not include inter-agency or intra-agency advisory, consultative or deliberative material." *N.J.S.A.* 47:1A–1.1. This exemption has been construed to encompass the deliberative process privilege, which has its roots in the common law. *Educ. Law Ctr. v. N.J. Dep't of Educ.,* 198 *N.J.* 274, 284, 966 *A.*2d 1054 (2009).

As articulated in case law prior to the enactment of OPRA in 2001, the deliberative process privilege has allowed the government to "withhold documents that reflect advisory opinions, recommendations, and deliberations comprising part of a process by which [its] decisions and policies are formulated." *In re Liquidation of Integrity Ins. Co.,* 165 *N.J.* 75, 83, 754 *A.*2d 1177 (2000). The privilege "is necessary to ensure free and uninhibited communication within governmental agencies so that the best possible decisions can be reached[.]" *Educ. Law Ctr., supra,* 198 *N.J.* at 286, 966 *A.*2d 1054. The privilege bars the "disclosure of proposed policies before they have been fully vetted and adopted by a government agency," thereby ensuring that an agency is not

judged by a policy that was merely considered. *Ibid.* It also avoids the confusion that could result from the release of information concerning matters that do not bear on an agency's chosen course. *Ibid.*

In order to invoke the deliberative process privilege, an agency must initially prove that a document is "pre-decisional," i.e., "generated before the adoption of an agency's policy or decision," and also "deliberative," in that it "contain[s] opinions, recommendations or advice about agency policies." *Integrity, supra,* 165 *N.J.* at 84–85, 754 *A.*2d 1177. " '[T]he key to identifying deliberative material must be how closely the material . . . relates to the formulation or exercise of . . . policy-oriented judgment or [to] the process by which policy is formulated.' " *McGee v. Twp. of E. Amwell,* 416 *N.J.Super.* 602, 619–20, 7 *A.*3d 785 (App.Div.2010) (quoting *Educ. Law Ctr., supra,* 198 *N.J.* at 295, 966 *A.*2d 1054). Purely factual material that does not reflect deliberative processes in any way is not protected by the privilege. *Integrity, supra,* 165 *N.J.* at 85, 754 *A.*2d 1177.

The Supreme Court applied these principles in *Education Law Center* by upholding the denial of access by an educational advocacy organization to an internal memorandum prepared by staff within the Department of Education. The memorandum outlined state aid simulation results for three alternative school funding formula structures. *Supra,* 198 *N.J.* at 280, 966 *A.*2d 1054. Staff had prepared the simulations to assist the agency in deciding what school funding approaches to recommend to the Governor and the Legislature. *Id.* at 300, 966 *A.*2d 1054. The Court concluded that the memorandum was "plainly integral to the agency's process of deliberation." *Ibid.* As such, the memorandum was deemed exempt from disclosure under OPRA as deliberative material. *Id.* at 301–02, 966 *A.*2d 1054.

The Court further held that, in spite of the Education Law Center's undisputed common-law interest in obtaining the memo-

randum as a party in the ongoing *Abbott* school funding litigation,[6] that interest was outweighed by the "detrimental impact that disclosure would have upon [the agency's] deliberative process[.]" *Id.* at 304, 966 *A.*2d 1054. Such disclosure "would impede agency functions by discouraging open and frank discussion and recommendations from agency employees to those higher up in [the agency's] hierarchy now and in the future." *Ibid.*

Notably, the Court declared the internal agency memorandum exempt from disclosure despite the fact that it evidently contained statistical and other factual information. *Id.* at 300, 966 *A.*2d 1054. The Court observed that "pre-decisional documents do not lose their protection from unwarranted public scrutiny merely because they may contain numerical or statistical data or information used in the development of, or deliberation on, a possible governmental course of action." *Id.* at 295, 966 *A.*2d 1054. The Court further noted that the privilege attached to the memorandum applied even though the agency ultimately did not render a decision, because the privilege shields the deliberative "process" itself, regardless of the outcome of any deliberations. *Id.* at 295–96, 966 *A.*2d 1054.

Here, in her findings and recommendations, later adopted in their entirety by the Council, the GRC's executive director accepted Calabria's certified assertion that the 2009 staff report was a draft document. As Calabria attested, the draft contained a preliminary analysis of complex information and statistics about HUMC's 2008 CN application, and made recommendations based upon that analysis. Relying upon several out-of-state decisions and in keeping with other prior rulings by the GRC in matters involving draft agency documents, the executive director concluded that the report was pre-decisional and that it fell within the deliberative process exemption. Accordingly, the GRC upheld the Department's denial of access to the report. We sustain that determination, for a number of sound reasons.

---

[6] *Abbott v. Burke,* 196 *N.J.* 544, 960 *A.*2d 360 (2008).

First, as described in Calabria's two certifications, the draft report expressing the staff's assessment and recommendations about the then-pending CN application is unquestionably pre-decisional. It is obvious from the context that the staff report encompasses "advisory opinions, recommendations, and delibera-tions comprising part of a process by which governmental deci-sions and policies are formulated." *Educ. Law Ctr., supra,* 198 *N.J.* at 285, 966 *A.*2d 1054 (quoting *Integrity, supra,* 165 *N.J.* at 83, 754 *A.*2d 1177). As Calabria makes clear, the draft report had not yet been finalized and presented to the SHPB or the Commis-sioner.

Appellant contends that any deliberative privilege attached to the staff report is undercut by the Department's routine practice of making such reports public several days in advance of the SHPB's hearings and, in fact, posting them on a web site. Al-though the Department does not dispute that custom, it is irrele-vant here because the staff report in question was still in draft form and had not yet reached the point of being circulated to the SHPB and to the public at large. As *Education Law Center* instructs, the fact that the SHPB and the Commissioner ultimate-ly never acted on HUMC's 2008 transfer application does not eviscerate the privilege. *Supra,* 198 *N.J.* at 300, 966 *A.*2d 1054.

The unrefuted draft status of the staff report at issue here is a critical facet of the analysis. By their very nature, draft docu-ments are preliminary and subject to further revision. *See Web-ster's II New College Dictionary* 349 (3d ed.2005) (defining a draft as a "preliminary outline, plan, or version"). Tentative findings and recommendations within them may be reconsidered, qualified, supplemented, withdrawn, and even, in some instances, radically changed to reflect entirely opposite conclusions. Given their non-final character, it makes eminent sense to treat such pre-decisional drafts as protected materials within the umbrella of the delibera-tive process privilege. Without such protection, policy advisers would be reluctant to express on paper or a computer screen their

tentative thoughts on a pending issue, lest their words be prematurely launched into the public domain.

For these sensible reasons, case law in our state and from other jurisdictions has repeatedly treated pre-decisional drafts as protected from disclosure. *See, e.g., State v. Ballard,* 331 *N.J.Super.* 529, 551–53, 752 *A.*2d 735 (App.Div.2000) (recognizing a privilege covering "the preliminary drafts of official documents or reports of a State agency [that] are no[t] [yet] official pronouncements"); *see also Wilson v. Freedom of Info. Comm'n,* 181 *Conn.* 324, 435 *A.*2d 353, 357–59 (1980); *Harwood v. McDonough,* 344 *Ill.App.*3d 242, 279 *Ill.Dec.* 56, 799 *N.E.*2d 859, 864, *appeal denied,* 206 *Ill.*2d 621, 282 *Ill.Dec.* 478, 806 *N.E.*2d 1066 (2003); *ATV Watch v. N.H. Dep't of Transp.,* 161 *N.H.* 746, 20 *A.*3d 919, 930 (2011).

By analogy, our own court rules similarly recognize the presumptive privilege extended to draft expert reports. *See* Pressler & Verniero, *Current N.J. Court Rules,* comment 2.2.10 on *R.* 4:10–2(d)(1) (2013). The Council reasonably adhered to similar principles in this case.

We also agree with the Council that the present circumstances are markedly distinguishable from those that allowed disclosure of the internal agency documents in *Correctional Medical Services, supra,* 426 *N.J.Super.* at 123, 43 *A.*3d 1174. In that case, we considered the applicability of the deliberative process privilege to government documents that were material to a breach of contract lawsuit. *Id.* at 120, 43 *A.*3d 1174. In deeming the privilege inapplicable and the documents discoverable, we concluded that there was a "profound distinction between the governmental activities underlying the contractual litigation occurring in [that] case and the governmental analysis leading to the formulation of policy positions and other decisions of comparable weight[.]" *Id.* at 122, 43 *A.*3d 1174. We further noted that " '[w]hen materials [can]not reasonably be said to reveal an agency's or official's mode of formulating or exercising policy-implicating judgment the deliberative process privilege is inapplicable.' " *Id.* at 123 (quoting *Petro-*

*leum Info. Corp. v. U.S. Dep't of Interior,* 976 *F.*2d 1429, 1435 (D.C.Cir.1992)).

Appellant maintains that this case is akin to *Correctional Medical Services* because, contrary to the finding of the GRC, the 2009 draft staff report allegedly had no bearing on the Department's formulation of policy, but merely reflected the Department's decision-making process regarding a single CN application. We disagree.

Given the comprehensive regulatory process intrinsic to CN applications and the vital public interests at stake, *see N.J.S.A.* 26:2H–1 to –11.1, the grant or denial of approval to HUMC for the transfer of PVH's license surely would have been a policy-infused decision. *See also In re Virtua–West Jersey Hosp. Voorhees,* 194 *N.J.* 413, 434–35, 945 *A.*2d 692 (2008) (noting the important public policies underlying CN determinations). A transfer of PVH's license and the reopening of the Westwood hospital, and the impact it would have had on patient care and the surrounding community, would have had very significant ramifications for health care planning in the region. The tentative advice prepared for the Department and the SHPB by staff undoubtedly would need to address those policy issues. The report, in its final form, would have been a key document relied upon by both the SHPB and the Commissioner had they been required to make a determination regarding HUMC's 2008 CN application. The situation here is therefore far different than the contract implementation context presented in *Correctional Medical Services.*

For these numerous reasons, we concur with the GRC that *Correctional Medical Services* is distinguishable from the matter before us, and the result there can be readily harmonized with the denial of access in this case under OPRA.

B.

Having concluded that the draft report is deliberative material, we turn to appellant's claim that there are countervailing interests that outweigh the Department's need for confidentiality. That

argument is misplaced with respect to appellant's OPRA-based claim, however, because we agree with the Attorney General that the statute creates an unqualified exemption for deliberative materials.

As we have noted, the definitional section of OPRA, *N.J.S.A.* 47:1A–1.1, states that:

> *"Government record" or "record" means* any paper, written or printed book, document, drawing, map, plan, photograph, microfilm, data processed or image processed document, information stored or maintained electronically or by sound-recording or in a similar device, or any copy thereof, that has been made, maintained or kept on file in the course of his or its official business by any officer, commission, agency or authority of the State or of any political subdivision thereof, including subordinate boards thereof, or that has been received in the course of his or its official business by any such officer, commission, agency, or authority of the State or of any political subdivision thereof, including subordinate boards thereof. *The terms shall not include inter-agency or intra-agency advisory, consultative, or deliberative material.*
>
> [Emphasis added.]

The statute contains no limitation or qualification on this exemption. Nor does the statute include any balancing test to be applied when a document meets the definition of "deliberative material."

In construing a statute, we must honor the objectives of the Legislature. " 'The Legislature's intent is the paramount goal when interpreting a statute and, generally, the best indicator of that intent is the statutory language.' " *Soto v. Scaringelli,* 189 *N.J.* 558, 569, 917 *A.*2d 734 (2007) (quoting *DiProspero v. Penn,* 183 *N.J.* 477, 492, 874 *A.*2d 1039 (2005)). A court should " 'ascribe to the statutory words their ordinary meaning and significance, and read them in context with related provisions so as to give sense to the legislation as a whole.' " *Ibid.* (quoting *DiProspero, supra,* 183 *N.J.* at 492, 874 *A.*2d 1039).

The definitional section of OPRA, which applies to all of the other provisions within the statute, is of particular importance. " '[W]here the Legislature has clearly and explicitly defined a term within a statute, we must assume it did so intentionally and with the intent that its stated definition be applied to that term

throughout the statute.'" *Commerce Bancorp, Inc. v. InterArch, Inc.,* 417 *N.J.Super.* 329, 336–37, 9 *A.*3d 1056 (App.Div.2010) (quoting *Simpkins v. Saiani,* 356 *N.J.Super.* 26, 32–33, 811 *A.*2d 474 (App.Div.2002)), *certif. denied,* 205 *N.J.* 519, 16 *A.*3d 384 (2011); *see also Febbi v. Bd. of Review,* 35 *N.J.* 601, 606, 174 *A.*2d 481 (1961) ("When the Legislature has clearly defined a term, the courts are bound by that definition."); *Nebinger v. Md. Cas. Co.,* 312 *N.J.Super.* 400, 406, 711 *A.*2d 985 (App.Div.1998) ("When the Legislature has specifically defined a term, that definition governs.").

The phrase "government record" is a critical term of art within OPRA. By carving out deliberative materials from the definition of a "government record," the Legislature manifestly did not invite the GRC or courts to dilute that exclusion by undertaking a balancing of the requestor's asserted need against the privilege.

We recognize that some prior opinions have stated or presumed that the privilege covering deliberative materials under OPRA is subject to an offsetting balancing test under that statute.[7] However, it does not appear from the text of any of those opinions that the argument of absolute exemption under OPRA now being made by the Attorney General here was made in those cases.

■ Indeed, in *Education Law Center,* our Supreme Court performed an analysis of the offsetting interests only in Part IV of its opinion, which solely addressed the appellant's common-law claims. *Supra,* 198 *N.J.* at 302–05, 966 *A.*2d 1054. Hence, to the extent that prior decisions of this court have stated or presumed that the OPRA exemption of deliberative materials is qualified, we part company with those decisions. The OPRA exemption, as it is set, expressed, and structured in the definitional section of the

---

[7] *See, e.g., Caliendo v. Velez,* 427 *N.J.Super.* 210, 217–18, 48 *A.*3d 357 (App.Div. 2012); *Tractenberg v. Twp. of W. Orange,* 416 *N.J.Super.* 354, 367, 4 *A.*3d 585 (App.Div.2010); *Fisher v. Div. of Law,* 400 *N.J.Super.* 61, 75, 946 *A.*2d 53 (App.Div.2008).

Act, is an unqualified one.[8] As a matter of law, the countervailing claims of need raised by appellant in seeking access do not affect the OPRA analysis.

## C.

 This leads us to consider appellant's alternative claim of entitlement to the draft report based upon a theory of a common-law right of access. *See Educ. Law Ctr., supra,* 198 *N.J.* at 302–03, 966 *A.*2d 1054; *Higg–A–Rella, Inc. v. Cnty. of Essex,* 141 *N.J.* 35, 660 *A.*2d 1163 (1995). The common-law right of access conceivably can reach a wider array of documents than OPRA. *Educ. Law Ctr., supra,* 198 *N.J.* at 302, 966 *A.*2d 1054. However, it is not absolute and requires a balancing of the plaintiff's public or private interest in the public record against the State's interest in preventing disclosure. *Higg–A–Rella, supra,* 141 *N.J.* at 46, 660 *A.*2d 1163.

 Under the common law, the privilege for deliberative materials can be overcome where the party seeking access (1) has a legitimate interest in obtaining the materials, and (2) demonstrates a compelling need for the material that overrides the agency's interest in confidentiality. *Educ. Law Ctr., supra,* 198 *N.J.* at 302–03, 966 *A.*2d 1054. In determining whether a party has demonstrated such an overriding need, a court should consider:

(1) the extent to which disclosure will impede agency functions by discouraging citizens from providing information to the government; (2) the effect disclosure may have upon persons who have given such information, and whether they did so in reliance that their identities would not be disclosed; (3) the extent to which agency self-evaluation, program improvement, or other decisionmaking will be chilled by disclosure; (4) the degree to which the information sought includes factual data as opposed to evaluative reports of policymakers; (5) whether any findings of public misconduct have been insufficiently corrected by remedial measures instituted by the investigative agency; and (6) whether any agency

---

[8] We need not address here whether the statutory exemption could be overridden by constitutionally-based claims of need, as none are asserted here.

disciplinary or investigatory proceedings have arisen that may circumscribe the individual's asserted need for the materials.

[*Id.* at 303, 966 A.2d 1054 (quoting *Loigman v. Kimmelman,* 102 *N.J.* 98, 113, 505 A.2d 958 (1986)).]

Only in "exceptional" cases will it be deemed consistent with the public interest to compel an agency to produce inter- or intra-agency advisory opinions. *See Integrity, supra,* 165 *N.J.* at 85, 754 A.2d 1177.

Appellant argues that Valley had an overriding need for access to the 2009 draft report since it believed that the report had recommended the denial of HUMC's 2008 CN application for lack of need. It asserts that the 2009 document would be of crucial relevance to Valley's appeal of the Department's grant of HUMC's 2011 CN application. Appellant further contends that the 2009 report could not be obtained from any other source, that the Department was the primary respondent in the litigation involving the 2011 CN application, and that the report was "essentially final" and could not have involved the formulation of policy.

Before addressing these claims of offsetting need, we must first consider what forum has the jurisdiction to evaluate them. The GRC in this case confined its analysis to the OPRA issues before it. The Council did not address Ciesla's common-law issues, even though he included them in his access complaint, because it regards its jurisdiction as limited to OPRA issues. We agree.

In establishing the GRC and defining its role in OPRA, the Legislature repeatedly, if not entirely consistently, restricted the Council's review to the disclosure of "government records." In relevant part, *N.J.S.A.* 47:1A–7(b) states that the GRC shall:

establish an informal mediation program to facilitate the resolution of disputes regarding access to *government records;*

receive, hear, review and adjudicate a complaint filed by any person concerning a denial of access to *a government record* by a records custodian;

issue advisory opinions, on its own initiative, as to whether a particular type of record is *a government record* which is accessible to the public;

prepare guidelines and an informational pamphlet for use by records custodians in complying with the law governing access to public records;

prepare an informational pamphlet explaining the public's right of access to government records and the methods for resolving disputes regarding access, which records custodians shall make available to persons requesting access to *a government record;*

prepare lists for use by records custodians of the types of records in the possession of public agencies which are *government records;*

. . . .

[Emphasis added.]

By contrast, the common law provides citizens with broader access to "public records." *N. Jersey Media Grp., Inc. v. N.J. Dep't of Personnel,* 389 *N.J.Super.* 527, 537, 913 *A.2d* 853 (Law Div.2006). Moreover, section 9 of OPRA, *N.J.S.A.* 47:1A–9, makes clear that the statute does not abrogate rights of access to records granted under other law, including decisional law.

Although reported case law has not squarely resolved this jurisdictional issue, we have frequently indicated that the GRC's jurisdiction is confined to OPRA issues. We have described the GRC as an agency "charged with adjudicating *OPRA disputes.*" *Bent v. Twp. of Stafford Police Dep't,* 381 *N.J.Super.* 30, 38, 884 *A.2d* 240 (App.Div.2005) (emphasis added); *accord Burnett v. Cnty. of Gloucester,* 415 *N.J.Super.* 506, 514, 2 *A.3d* 1110 (App.Div. 2010); *MAG Entm't, LLC v. Div. of Alco. Bev. Control,* 375 *N.J.Super.* 534, 546, 868 *A.2d* 1067 (App.Div.2005); *see also McGee, supra,* 416 *N.J.Super.* at 613, 7 *A.3d* 785 ("[t]he GRC is authorized to interpret OPRA"). The GRC is "empowered to render decisions 'as to whether the record which is the subject of the complaint is a *government record* which must be made available for public access.'" *McGee, supra,* 416 *N.J.Super.* at 613, 7 *A.3d* 785 (emphasis added) (quoting *N.J.S.A.* 47:1A–7(e)).

In *Paff v. New Jersey Department of Labor, Board of Review,* 379 *N.J.Super.* 346, 352–53, 878 *A.2d* 31 (App.Div.2005), an appeal from the GRC, we described the GRC's jurisdiction in the following restrictive manner, tied to the statutory context of OPRA:

The GRC has the responsibility to mediate, investigate and adjudicate complaints filed by persons who are denied access to government records. *N.J.S.A.* 47:1A–7b–

f. A person denied access to a government record has the option to file an action in Superior Court or a complaint with the GRC. *N.J.S.A.* 47:1A–6.... While the GRC must make an initial "determination as to whether the complaint is within its jurisdiction or frivolous or without any reasonable factual basis," *N.J.S.A.* 47:1A–7e, only one provision *of OPRA* limits the GRC's jurisdiction. *N.J.S.A.* 47:1A–7g provides that the GRC "shall not have jurisdiction over the Judicial or Legislative Branches of State Government or any agency, officer, or employee of those branches." By inference, the GRC otherwise has jurisdiction to adjudicate all complaints about denial of access to a "government record" *based on OPRA. See N.J.S.A.* 47:1A–1.1; *N.J.S.A.* 47:1A–5; *N.J.S.A.* 47:1A–6.

[Emphasis added.]

Likewise, in *Serrano v. South Brunswick Township*, 358 *N.J.Super.* 352, 373, 817 *A.*2d 1004 (App.Div.2003), which involved an appeal from a GRC decision, Judge Coburn noted in a concurring opinion that "[a] proceeding under the common law [for access to the at-issue 911 tapes] would have to be instituted in court and not before the GRC."

■■■ We must accord substantial deference to the Council's interpretation of the limits of the authority bestowed upon it by its own enabling statute. "It is settled that '[a]n administrative agency's interpretation of statutes and regulations within its implementing and enforcing responsibility is ordinarily entitled to our deference.' " *Wnuck v. N.J. Div. of Motor Vehicles*, 337 *N.J.Super.* 52, 56, 766 *A.*2d 312 (App.Div.2001) (quoting *In re Progressive Cas. Ins. Co.*, 307 *N.J.Super.* 93, 102, 704 *A.*2d 562 (App.Div.1997)). As a practical matter, it also is institutionally sounder to have courts, rather than the GRC, evaluate the strengths and weaknesses of common-law arguments, in keeping with the functions that judges routinely perform in interpreting and applying the common law.[9]

These numerous considerations amply show that the GRC correctly declined in this case to assert jurisdiction over appellant's

---

[9] We do not anticipate our jurisdictional holding will cause a dramatic shift of access complaint filings from the GRC to the trial courts. Despite the Council's inability to adjudicate common-law issues, it will remain an inexpensive and efficient administrative forum for document requesters to present OPRA claims. Moreover, the Council itself apparently has limited its purview to OPRA matters.

common-law claims. That leads us by necessity to consider what to do about those unresolved common-law issues. Although we conceivably could leave those issues for presentation to a trial court, we instead choose, for sake of expediency and finality, to exercise our original jurisdiction under *Rule* 2:10–5 and resolve them here.

Bearing in mind the common-law principles expressed in the case law, and the presumption of privilege customarily attached to deliberative materials, we conclude that appellant has failed to overcome that presumption here. Although Valley arguably has a keen interest in obtaining the staff report as a regulated competitor of HUMC and as a vigorous opponent of HUMC's proposal for a new site, its desire to obtain that internal draft—which was never acted upon by either the SHPB or the Commissioner—does not outweigh the agency's strong interests in keeping its internal draft confidential.

Even if one presumes, for the sake of discussion, that the Department's staff disfavored granting HUMC a CN in July 2009, that hypothetical earlier recommendation would not bear significantly upon the appeal of the Department's approval of HUMC's subsequent CN application in February 2012. The 2008 and 2011 CN applications were not identical. The 2011 CN application had the benefit of three more years of data and was submitted at a different time in a continually-evolving health care market and regulatory climate.

As our companion opinion today notes, HUMC's successful 2011 CN application stands on its own merits. The staff report pertaining to HUMC's withdrawn 2008 CN application is not needed to make an assessment of the 2011 application's compliance with the statutory standards for CN approvals. Moreover, because the draft report was not final and was never acted upon, it would not be competent proof of the views of either the SHPB or the Commissioner. The report is analogous to the internal staff memorandum in *Education Law Center, supra*, 198 *N.J.* at 300, 966 *A.*2d 1054, which likewise was never acted upon by the agency.

Furthermore, for the reasons we have already stated, we reject appellant's claim that the recommendations within the draft report would not have implicated the ongoing formulation of regulatory policy. To the contrary, we are satisfied that a compelled release of a draft of this nature, in such a policy-laden context, would invariably have a chilling effect upon "open and frank discussion and recommendations from agency employees ... now and in the future." *Educ. Law Ctr., supra,* 198 *N.J.* at 304, 966 *A.*2d 1054.

In sum, we conclude that the reasons that favor maintaining the confidentiality of the draft report far outweigh the reasons cited by appellant for its disclosure. Appellant's common-law claims are consequently rejected.

The final agency decision rejecting appellant's access complaint is therefore affirmed.