**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R.1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4347-15T1

BAY HEAD-MANTOLOKING LAND
COMPANY,

    Plaintiff-Appellant,

v.

BEVERLY KONOPADA, Clerk of
the Borough of Mantoloking,
Custodian of Records, and
THE BOROUGH OF MANTOLOKING,

    Defendants-Respondents,

and

NEW JERSEY DEPARTMENT OF
ENVIRONMENTAL PROTECTION,

    Defendant/Intervenor-
    Respondent.

_____

Argued August 1, 2017 — Decided August 14, 2017

Before Judges Sabatino, O'Connor and Whipple.

On appeal from Superior Court of New Jersey,
Law Division, Ocean County, Docket No. L-3361-
15.

Donald F. Burke argued the cause for
appellant.

Jill L. Thiemann argued the cause for respondent Beverly Konopada, Clerk and Records Custodian of the Borough of Mantoloking and the Borough of Mantoloking (O'Malley, Surman & Michelini, attorneys; Ms. Thiemann, on the brief).

John P. Kuehne, Deputy Attorney General, argued the cause for respondent New Jersey Department of Environmental Protection (Christopher S. Porrino, Attorney General, attorney; Raymond R. Chance, III, Assistant Attorney General, of counsel; Mr. Kuehne, on the brief).

PER CURIAM

This appeal stems from the trial court's denial of plaintiff's request for documents under the Open Public Records Act, N.J.S.A. 47:1A-1 to -6 ("OPRA"), and the common law. Plaintiff seeks copies of draft appraisal reports furnished to the Borough of Mantoloking ("the Borough") in connection with anticipated eminent domain litigation for certain beachfront properties located in the municipality.

The Borough, in coordination with the Army Corp of Engineers and the New Jersey Department of Environmental Protection ("DEP"), is involved in a storm water fortification project to protect the shoreline in the wake of Superstorm Sandy ("Sandy"). As part of that project, the DEP needs to acquire easement rights for several properties along the shoreline.

In connection with the anticipated eminent domain cases, the Borough and the DEP arranged for a certified real estate appraiser to evaluate the properties, so that the governmental entities could enter into good faith negotiations with the owners, as required under the Eminent Domain Act, N.J.S.A. 20:3-1 to -50. Nine draft appraisals for various parcels were generated. Five of those drafts were finalized, and the appraisals were turned over to the property owners to pursue negotiations. Four draft appraisals for the other parcels were not initially disclosed. However, after the Borough obtained finalized appraisals from a different expert, the draft appraisals by the first expert were turned over to the property owners along with the finalized ones.

Plaintiff, Bay Head-Mantoloking Land Company, LLC, filed the present action after its request to obtain the four draft appraisals was denied. The Borough and the DEP, which intervened in the litigation, argued that the request for disclosure was appropriately denied on two independent grounds: (1) the deliberative process privilege for draft reports; and (2) the attorney work product privilege. The trial court agreed with defendants that these privileges pertained, and therefore the requested draft appraisals did not have to be provided to plaintiff, either under OPRA or under the common-law balancing test.

On appeal, plaintiff contends that none of the asserted grounds for non-disclosure apply here as a matter of law, and that plaintiff should have been provided with the draft appraisals. For the reasons that follow, we affirm.

I.

On October 29, 2012, Superstorm Sandy first touched land in New Jersey at Brigantine, with eighty miles-per-hour winds and floodwaters that decimated large portions of the State's coast. According to a certification by the DEP manager of coastal engineering, the coastal areas spared by Sandy were those with engineered beaches and dunes that had been built to the Army Corps of Engineers standards, whereas towns without such protections "fared much worse . . . suffering significant, and often extreme damage." Of particular import to this case, the DEP manager noted that Sandy overran Mantoloking Borough and adjacent Brick Township, and thereby "carved new inlets through the Barnegat Peninsula landmass, connecting ocean and bay in new places and cleaving the towns into several islands isolated from the mainland."

Towns in the northern portion of Ocean County generally did not replenish those beaches and dunes in the wake of Sandy. Unfortunately, on January 23, 2016, Winter Storm Jonas furthered damaged the coastline. That second storm caused Brick Township

4

to suffer elevation losses from ten to fifteen feet and narrowed the beach's width by ninety to one hundred feet. In the Borough of Mantoloking, the elevation losses were seven to eight feet and a beach narrowing of 100 feet.

In response to this storm damage, the federal government allocated funding under the Disaster Relief Appropriations Act of 2013, Pub. L. No. 113-2, to "construct a system of engineered beaches and dunes across the New Jersey coast." As the state agency involved in that effort, the DEP was tasked to engineer beach and dune projects, and secure easements from private landowners when those easements could not be voluntarily acquired.[1]

To advance these objectives, the DEP formulated what is known as the "Manasquan Inlet to Barnegat Inlet Hurricane and Storm Damage Reduction Project" ("the Project"). The Project sought to construct fourteen miles of dunes and berm from Berkeley Township, near Island Beach State Park, northward to Point Pleasant. The Project encompasses nine municipalities, including Mantoloking and Brick.

If the DEP could not voluntarily secure a property owner's participation, the agency was to acquire the necessary easements

---

[1] The authority of the DEP to engage in eminent domain proceedings to secure these easements was recently upheld by this court. See Dep't of Envtl. Prot. v. N. Beach 1003, ___ N.J. Super. ___, ___ (App. Div. 2017) (slip op. at 13).

through one of three ways:  (1) the Eminent Domain Act, <u>N.J.S.A.</u> 20:3-1; (2) the Disaster Control Act, <u>N.J.S.A.</u> App. A:9-51.5; or (3) <u>N.J.S.A.</u> 12:3-64.  Toward these ends, Governor Christie issued Executive Order No. 140 (Sept. 25, 2013) ("EO 140"), and directed the DEP and the Attorney's General Office "to coordinate those legal proceedings necessary" to achieve the State's shore protection goals.

Within the Borough, the DEP needed to acquire 264 properties for the storm water fortification project.  The Borough and the DEP jointly conducted outreach and acquired 244 of the needed parcels through voluntary transfers by their owners.  That left twenty outstanding parcels owned by nine separate property owners — including the plaintiff[2] in this case.  According to a submission to the trial court from the Deputy Attorney General who has overseen legal aspects of the Project, five of the nine properties at issue here were vacant, and the other four contained structures.

According to a certification from the Borough's outside counsel, he recommended to the Borough that they hire, while "acting in concert with" the DEP, a real estate valuation expert,

---

[2] We note there is some dispute, not adjudicated by the trial court or properly before this court, as to whether plaintiff is a true owner of property within the scope of the beach restoration project.

Richard E. Hall, MAI, CRE[3] to appraise the properties. The DEP also engaged John J. Curley, Esq. to serve as special counsel to oversee the land acquisitions in the Borough.

On August 20, 2013, the Borough passed a resolution authorizing a contract with Hall to appraise properties related to the Project. In the resolution, Hall was directed to value potential property costs, anticipating that an expert would be required "in the legal proceedings which are initiated to acquire easements." The Borough unanimously approved the contract.[4]

The DEP and Curley provided guidance and oversight to Hall in conjunction with his appraisal services. Although the Borough paid Hall directly for his services, it did so with the understanding that the DEP would reimburse it. Along with his professional services contract, Hall signed a "Common Interest and Confidentiality Agreement" with both the DEP and Borough.

According to the trial court's recitation of the facts in its oral ruling, plaintiff owns property needed to complete the Project, although not the specific parcels associated with the

---

[3] These professional accreditations indicate that Hall is a member of the Appraisal Institute ("MAI") and also is a commercial real estate broker ("CRE").

[4] None of the parties argue that these professional services contracts required public bidding. See N.J.S.A. 40A:11-5(1)(a)(i)(outlining an exception under Local Public Contracts Law to include contracts for professional services).

OPRA requests in this case. On October 6, 2015, plaintiff's attorney e-mailed a document request to the custodian of records for the Borough, and also to a member of the law firm serving as the Borough's outside counsel.

Plaintiff's attorney sought "all appraisals whether final, draft or preliminary as well as the authorization to pay for such appraisals." Plaintiff requested the records under OPRA, the common law, and unspecified provisions under the New Jersey Constitution. Specifically, he requested appraisals for the nine properties as to which the owners had declined to deed their properties voluntarily to the Borough: 1071, 1121, 1215, 1217, 1513, 1067, and 1021 Ocean Avenue, and 965 and 991 East Avenue.

The Borough's outside counsel responded to plaintiff's request via email on October 19, 2015. Counsel included several attachments, which included: (1) minutes of the Borough Council meetings appointing Hall as the appraiser and later authorizing payment to him for services he rendered, and (2) the agreement between Hall and the Borough.[5]

---

[5] It is unclear whether this agreement is separate from the Common Interest Agreement mutually executed among Hall, the DEP, and the Borough.

The Borough's outside counsel withheld the draft appraisals sought by plaintiff for the following reasons, as expressed in her email:

> The requested appraisals are not being provided. They are protected by the Attorney-Client privilege as the work has been performed under the direction of the NJ DEP's Counsel in anticipation of imminent condemnation litigation. These appraisals are work product covered by the Common Interest Agreement attached. These appraisals were prepared so as to allow the State of New Jersey to tender an offer to the property owners and negotiate in "good faith" as the law requires. As of this date the appraisals have been completed and are under review by the NJ DEP. Offer letters will be mailed to the subject property owners in the immediate future. Not only are these appraisal[s] exempt under N.J.S.A. 47:1A-1.1(7), but disclosure of these appraisals may jeopardize the future "good faith" negotiations or result in one or both parties suffering potential injury, including financial injury. Upon balancing the interests of the subject property owners as well as the Borough and the State of New Jersey who will be the parties to said "good faith" negotiations against any requirement of disclosure under [OPRA], the Borough and the State of New Jersey have concluded that the public interest in confidentiality of these appraisals outweighs any private interest to right of access under OPRA.

Although outside counsel wrote in her email that she would attach the Common Interest agreements between the State and the Borough and the one signed by Hall, she actually withheld both of them. Outside counsel characterized the Common Interest

9

agreements as work product and therefore privileged under OPRA. Lastly, outside counsel declined to release the requested draft appraisals under the common law.

After the Borough denied the document request, plaintiff brought the present lawsuit in the Law Division in December 2015.[6] In plaintiff's two-count complaint, it asked the Law Division to order the Borough to provide plaintiff with the nine appraisals, either under OPRA or the common law right of access.

On December 3, 2015, the Borough's outside counsel sent plaintiff final appraisals for the five vacant properties that had been initially requested in plaintiff's OPRA application.[7] As to those properties, the DEP had sent offer letters to the owners, engaged in good faith negotiations, and had commenced eminent domain litigation to acquire them. With respect to these disclosed appraisals, Hall wrote that he drafted them for the State as his client, but they were also for the DEP and Borough.[8] Hall

_____

[6] According to the DEP's motion to intervene, plaintiff submitted an identical OPRA request to the DEP, and that state agency denied access, citing the same privileges as the Borough. For reasons that are unclear, plaintiff only named the Borough as a defendant in its OPRA complaint.

[7] Thiemann sent Burke copies of the following property appraisals: 1215, 1121, and 1021 Ocean Avenue and 965 and 991 East Avenue.

[8] Although the DEP is an entity of the State, Hall nonetheless framed his client relationship in this manner.

characterized the reports as documents to be used "to assist the clients and intended users in real property acquisition negotiations in a Federal Project and/or determination of the fair market value of the property rights proposed to be conveyed" that are necessary for the Project.

Although the disclosures did not specify the precise amount of property proposed to be taken, for each parcel Hall was asked to quantify the value of a twenty-foot-wide easement running north-to-south along each property's eastern ocean-side border. His market value appraisals for the five parcels ranged from $3,150 to $12,285.

According to the Deputy Attorney General, as of December 23, 2015, the appraisals for the four remaining parcels were then in draft form "and remain subject to further review and revisions." The Deputy Attorney General represented that once they were finalized, the appraisals and corresponding offer letters would be sent to the property owners.

In its answer to plaintiff's complaint, the Borough similarly represented that it would release the remaining four property appraisals "immediately . . . once they are final, approved and released to the respective property owners whose interests are being valued." The Borough also asserted that it was bound by the Common Interest Agreement with the DEP, which "expressly

prohibit[ed] the release of the requested appraisals[.]" The Borough asserted that the Common Interest Agreement itself was privileged, and would only supply the trial court with a copy under seal for an <u>in camera</u> review.

The day before oral argument in the Law Division on plaintiff's application, the Deputy Attorney General wrote the court with a factual update. He reported that Hall had been released[9] from his contract to finish the four outstanding appraisals in this case. In his place, the Borough hired a different appraiser, Jeffrey Otteau, to provide appraisals for the same four parcels. The Deputy Attorney General indicated that Otteau's appraisals "after completion, shall be used by the State in evaluating offer letters for the four property owners with whom the State has yet to enter good faith negotiations in accordance with the Eminent Domain Act." He added that, "[i]f the parties arrive at an impasse during negotiations, the Otteau appraisals shall be used in any condemnation action against the property owners."

That same day, plaintiff's counsel wrote the Borough's attorney, requesting that the Borough release Hall's four

---

[9] The letter did not disclose whether the DEP or the Borough had taken the action to release Hall from his contract, or why he was released.

appraisals because the claim of exemption no longer applied. In a response letter that same day, the Borough denied plaintiff's request. The Borough maintained its position that Hall's draft appraisals were exempt from plaintiff's requests under the deliberative process privilege.

The matter was argued before Assignment Judge Marlene Lynch Ford. After considering those arguments, Judge Ford immediately issued an oral ruling, rejecting plaintiff's requests and adopting the multiple grounds collectively invoked by the Borough and the DEP supporting their non-disclosure of the draft appraisals.

First, with respect to the deliberative process privilege, Judge Ford noted that the privilege's purpose is to "permit the government to withhold documents that reflect advisory opinions, recommendations, and deliberations comprising part of the process by which governmental decisions and policies are formulated." The judge found it was "clear" that the documents requested here "were part of a pre-decisional and deliberative process relative to the acquisition of certain interest and property[.]" The judge noted the governmental decision to be made concerned the market amount to pay a property owner for the subject property. She reasoned that the appraisal was part of that decision-making process.

Judge Ford further noted that the appraisals' draft nature inherently reflected that Hall's appraisals were not final. She

reasoned that to require defendants to disclose them at this point would "prematurely disclose the views of the agency." Although the judge stated she was "sensitive" to plaintiff's OPRA concerns, she concluded that "the undisputed facts are fairly clear that this was prepared for the purpose of engaging in" eminent domain negotiations.

As an alternative basis for rejecting plaintiff's complaint, the judge ruled that the draft appraisals were "certainly part" of the work-product doctrine of the attorney-client privilege. Judge Ford observed that if the negotiations failed, the only way the DEP would be able to acquire the property would be through litigation. To support such litigation, the government had the subject documents prepared by an expert appraiser in advance. The judge was not persuaded that it made any material difference that the Borough, and not its counsel, had hired the expert.

Third, the judge rejected plaintiff's claim of a common law right of access. In this regard, the judge determined that the negotiation process for eminent domain should be "cloaked within some degree of confidentiality," so as to protect both the DEP and the private property owners' interests.

Another factor that guided the trial court was whether the document had factual data "as opposed to evaluative reports." Here, the judge found that the draft appraisals were evaluative,

14

consisting of the appraiser's opinion. She concluded this factor outweighed plaintiff's interest in obtaining access.

In sum, the judge concluded that the government's interest in having "fair and meaningful eminent domain negotiations" would be impeded if draft appraisals had to be released to third parties, such as plaintiff, who were not part of the direct negotiations.

In a two-page corresponding order issued on April 25, 2016, Judge Ford denied plaintiff's request for the draft appraisals under both OPRA and the common law. She did, however, order the defendants to provide a "Vaughn Index" describing the withheld records.

This appeal followed.

## II.

Plaintiff contends that the trial court erred in denying its request for disclosure under both OPRA and the common law. Although plaintiff acknowledges the public policies that generally shield consultations with expert witnesses in connection with pending or anticipated litigation, it argues that the particular circumstances here call for a limited exception to those policies of confidentiality, because no litigation was pending or imminent when the draft appraisals were generated. Plaintiff further argues that the context of pre-suit eminent domain negotiations under Title 20 also distinguishes the present matter from situations in

which experts are consulted or retained by the government in the ordinary course of civil or criminal litigation.

In addition, plaintiff asserts that the draft appraisals were not pre-decisional, nor were they documents created for the "dominant" purpose of assisting the government in matters of policy, and thus the deliberative process privilege does not pertain.

Lastly, plaintiff argues that, apart from its asserted statutory rights as a requestor under OPRA, it had a predominating interest under the common law to have been supplied with the documents when they were sought. Plaintiff consequently seeks reversal of the trial court's decision or, at a minimum, an order remanding this matter directing in camera review by the trial court.

Having fully considered the parties' arguments, we affirm the trial court's rejection of plaintiff's access claims, substantially for the reasons soundly expressed in Judge Ford's April 8, 2016 bench opinion. On the whole, we agree with defendants and the trial court that both the work product and deliberative process privileges apply here. We add only a few amplifying comments.

With respect to the work product analysis, plaintiff's heavy reliance on this court's opinion in Tractenberg v. Township of

A-4347-15T1

West Orange, 416 N.J. Super. 354 (App. Div. 2010) is unavailing. The factual context in Tractenberg involved a situation in which a municipality had obtained real estate appraisals for vacant property the governing body was considering purchasing to preserve open space. Id. at 362. After those appraisals were generated, lengthy debate about the township's possible acquisition of the land took place for over two years, without any decision or action. Id. at 379. By that point, the township still had not initiated negotiations to purchase the land, nor were such negotiations "probable any time in the near future." Ibid. In that setting, we concluded in Tractenberg that "the mere potential for future negotiations, without a strong showing that negotiations [were] probable," negated the township's assertion of privilege under OPRA. Ibid. Here, by contrast, when the nine draft appraisals were all generated, future eminent domain litigation was far more likely, especially given the federal and State imperatives of the Superstorm Sandy restoration project. Hence, Tractenberg is not on point.

Defendants' assertion of the work product privilege is also bolstered by the policies reflected in Rule 4:10-2(d)(1), which was specifically amended in 2002 on the recommendation of the Civil Practice Committee so as to insulate draft expert reports as well as related oral and written communication between the

attorney and the expert.  See Pressler & Verniero, Current N.J. Court Rules, comment 5.2.1 on R. 4:10-2(d)(1) (2016); see also Adler v. Shelton, 343 N.J. Super. 511, 530 (Law Div. 2001) (noting the importance of protecting communications between an attorney and a hired expert from disclosure in discovery).  The same principles apply here in the context of adversarial proceedings and negotiations that were anticipated between the government as condemnor and the individual private property owners as condemnees.  Given that beach restoration would be completed under federal and State oversight, the acquisitions are hardly conjectural.

We further agree that the deliberative process privilege provides an independent justification for the withholding of the draft appraisals.  The draft nature of Mr. Hall's expert appraisal is undisputed.  The drafts are also clearly pre-decisional, as they were generated before both (1) a decision by the government to rely upon (or reject) the expert's work in eminent domain negotiations and litigation, and (2) future decisions by the government agencies in response to any counter-proposals that might be made by the individual property owners.  See Ciesla v. N.J. Dept. of Health & Sr. Servs. 429 N.J. Super. 127, 135 (App. Div. 2012) (applying the deliberative process privilege to draft reports supplied to the Department of Health to aid in deciding,

as a regulator, whether to authorize the acquisition of a hospital by another hospital). Although the property acquisition and valuation context here is arguably less policy-laden than that involved in Ciesla, the same kinds of institutional concerns to promote unimpeded internal governmental deliberations nonetheless apply.

We further concur with the trial court and defendants that plaintiff has not made the "greater showing" required under the common law balancing test to compel disclosure independent of OPRA. See N. Jersey Media Grp., Inc. v. Twp. of Lyndhurst, ___ N.J. ___, ___ (2017) (slip op. at 45). At best, plaintiff is a mere bystander to the other property acquisitions. State v. Town of Morristown, 129 N.J. 279, 287-90 (1992). Moreover, plaintiff could have sought to intervene in one or more of the other eminent domain actions (which it apparently attempted, but then withdrew) if it felt its proprietary interests were sufficiently implicated. If and when defendants attempt to obtain plaintiff's own parcel, we presume that competing appraisal reports specific to that property are likely to be exchanged, analyzed, and, if necessary, litigated.

Lastly, we must point out that during the oral argument on the appeal, counsel for both defendants represented that if plaintiff renews its request to have the draft reports provided,

19

they will now furnish Hall's appraisals without objection, given that the drafts have been supplied to the individual property owners during the pendency of this appeal. In essence, the live controversy that existed at the time of the trial court ruled is now moot (although for independent reasons, and not as the result of plaintiff's efforts).[10] Consequently, there is no need for a remand or any further proceedings. "[O]ur courts normally will not entertain cases where a controversy no longer exists and the disputed issues have become moot." DeVesa v. Dorsey, 134 N.J. 420, 428 (1993).

Affirmed, without prejudice to plaintiff presenting a renewed request to defendants to obtain the draft appraisals, which they have represented they will supply.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

---

[10] We note that defendants' present willingness to supply plaintiff with the draft appraisals was not clearly expressed in their briefs on appeal, which stated that the drafts had been supplied to the other property owners, without indicating whether any conditions on further dissemination pertained. The DEP's brief contains a footnote stating that the DEP "alerted Appellant's counsel when the remaining appraisals became available" but does not clarify to whom they became available. We lament that this apparent misunderstanding among counsel resulted in this court hearing an appeal over a dispute that evidently could have been resolved much sooner.

A-4347-15T1