

# TAX COURT OF NEW JERSEY

**JOSHUA D. NOVIN**
**Judge**

Dr. Martin Luther King, Jr. Justice Building
495 Dr. Martin Luther King, Jr. Blvd., 4th Floor
Newark, New Jersey 07102
Tel: (609) 815-2922, Ext. 54680

**NOT FOR PUBLICATION WITHOUT THE APPROVAL
OF THE TAX COURT COMMITTEE ON OPINIONS**

July 7, 2025

Lauren M. Manduke, Esq.
Geoffrey N. Weinstein, Esq.
Cole Schotz, P.C.
25 Main Street
P.O. Box 800
Hackensack, New Jersey 07602-0800

Anthony D. Tancini, Deputy Attorney General
Division of Law
Richard J. Hughes Justice Complex
P.O. Box 106
Trenton, New Jersey 08625-0106

> Re:  Michael Giammarino and Roseann Giammarino v. Dir., Div. of Taxation
> Docket No. 001040-2024

Dear Counsel:

This letter shall constitute the court's opinion on the Office of the Governor's ("OOTG") motion seeking to quash the Subpoena Duces Tecum and Ad Testificandum served on Kate McDonnell, Esq., Chief Counsel to the Governor, dated March 7, 2025, under R. 1:9-2 ("motion to quash").

For the reasons explained more fully below, the motion to quash is denied, in part, and granted, in part.

## I.  Procedural History and Findings of Fact

Pursuant to R. 1:7-4, the court makes the following factual findings and conclusions of law based on the briefs and certifications in support of, and in opposition to, the motion to quash.

On February 26, 2024, Michael Giammarino and Roseann Giammarino ("plaintiffs"), filed






a complaint contesting the Director of the New Jersey Division of Taxation's ("defendant"), denial of plaintiffs' 2018 tax year gross income tax refund claim in the amount of $5,518,184, under letter dated November 30, 2023. The denial was made pursuant to the New Jersey Gross Income Tax Act, N.J.S.A. 54A:1-1 to 12-6 (the "New Jersey Gross Income Tax Act").

On or about March 7, 2025, plaintiffs' counsel issued a Subpoena Duces Tecum and Ad Testificandum to Kate McDonnell, Esq., Chief Counsel to the Governor (the "Subpoena"). The Subpoena directed the OOTG to produce the following documents or testimony:

1. All documents that refer or relate to any communications regarding Plaintiffs.

2. All documents that refer or relate to Assembly Committee Substitute for Assembly Bill No. 3088 ("A. 3088") and Senate Bill No. 2019 ("S. 2019") as returned by Governor Phil Murphy on June 30, 2018.

3. All documents and communications that refer or relate to the July 1, 2018 amendment to N.J.S.A. § 54A:2-1, made effective retroactively to January 1, 2018.

4. All documents that refer or relate to any communications and/or discussions regarding N.J.S.A. § 54A:2-1(a)6 and (b)6.

5. All documents that refer or relate to any communications and/or discussions regarding the July 1, 2018 amendment to N.J.S.A. § 54A:2-1, made effective retroactively to January 1, 2018 (L. 2018, c. 45, § 10, A. 3088).

6. All documents that refer or relate to discussions, communications, statements, and/or decisions regarding enactment of the amendment to N.J.S.A. § 54A:2-1(a)6 and (b)6.

7. All documents that refer or relate to discussions, communications, statements, and/or decisions regarding applying the amendment to N.J.S.A. § 54A:2-1 retroactively to January 1, 2018.

8. All documents that refer or relate to internal memorandums, discussions, communication, and /or statements between You and






any member of the New Jersey State legislature regarding the amendment to N.J.S.A. § 54A:2-1.

9.      All documents and communications that refer or relate to Your estimate that the increase in the marginal tax rate for income over $5 million from 8.97 percent to 10.75 percent, as enacted in (L. 2018, c. 45, § 10, A. 3088), may yield additional gross income tax revenue of $280.0 million in fiscal year 2019. Reference is made to the Legislative Fiscal Estimate, page 3.

10.     All documents and communications that refer or relate to Your estimate that the estimated increase in revenue collection in fiscal year of $280.0 million would be split between "$255.0 million from the annualized impact of the new rate and $25.0 million in nonrecurring revenue attributable to the retroactive application of the tax rate increase to January 1, 2018." Reference is made to the Legislative Fiscal Estimate, page 3.

11.     All documents and communications that comprise, refer, or relate to the "information provided informally by the Executive" that formed the basis of the Department of the Treasury projection of increased state revenue in fiscal year 2019 due to the increase in the marginal tax rate for income over $5 million from 8.97 percent to 10.75 percent. Reference is made to the Legislative Fiscal Estimate, page 3.

On March 28, 2025, the OOTG filed the instant motion to quash the Subpoena. However, to appreciate the context of plaintiffs' complaint, the Subpoena, and the motion to quash, a brief discussion of the 2018 amendments to the New Jersey Gross Income Tax Act is necessary.

On January 9, 2018, February 5, 2018, and April 5, 2018, Senate Bill Nos. S. 64/S. 1515/S. 2407 were introduced in the New Jersey State Senate. On February 8, 2018, Assembly Bill No. 3088 was introduced in the New Jersey Assembly.[1]  In total, the pieces of legislation proposed several modifications to the New Jersey Gross Income Tax Act, including increasing "the

---

[1]  On June 18, 2018, A. 3088 was combined with S.64/S. 1515/S. 2407 as "Substitute for Assembly, No. 3088," in the New Jersey State Senate and adopted by the New Jersey Assembly Budget Committee (A. 3088 and Substitute for Assembly, No. 3088 shall be collectively referred to herein as "A. 3088.")









maximum GIT deduction allowed for homestead property taxes paid, increas[ing] the State earned income tax credit to 40 percent of the federal credit over three years, provid[ing] a credit for certain expenses paid for the care of a child or dependent, and taxes certain 'investment management services.'" Assembly Budget Committee, Statement to A. 3088 dated June 18, 2018.[2]

On May 8, 2018, in two separate commercial transitions, plaintiffs sold equity interests that they owned in Ferraro Foods, Inc., generating capital gains of $161,358,177 and $155,030,406.

On or about June 30, 2018, Governor Phil Murphy conditionally vetoed A. 3088. In conditionally vetoing the legislation, Governor Murphy expressed that he "had some problems with the revenue side of the Legislature's original Fiscal Year 2019 budget." Governor's Recommendations for Reconsideration Statement to Assembly Committee Substitute for Assembly Bill No. 3088 (June 30, 2018) (P.L. 2018, Chapter 45), available at https://pub.njleg.state.nj.us/Bills/2018/A3500/3088_V1.PDF.[3] The Governor further "questioned whether the original legislative revenue plan adequately supported the investments that we all want for the people of New Jersey. . . ." Ibid. Thus, in returning A. 3088 to the New Jersey Legislature for reconsideration he proposed, "a modest increase in the income tax for multi-millionaires to ensure that all New Jerseyans begin to pay a fair share to support important investments like those included in this bill." Ibid. His proposed change would increase the tax rate on income over $5,000,000 from 8.97% to 10.75%. Specifically, the Governor's Recommendations for

---

[2] On June 18, 2018, the New Jersey Senate introduced Senate Bill 2019 ("S. 2019"). S. 2019 was an appropriations bill proposed arrogating "$36,517,421,000 in State funds . . . for the State budget for Fiscal Year 2019." Senate Budget and Appropriations Committee Statement to S. 2019, dated June 18, 2018.

[3] The Governor's conditional veto also recommended a "technical change to the child and dependent care credit . . . to limit its application only to New Jersey residents." Governor's Recommendations for Reconsideration Statement to Assembly Committee Substitute for Assembly Bill No. 3088 (June 30, 2018).






Reconsideration Statement to Assembly Committee Substitute for Assembly Bill No. 3088

proposed enacting the following amendments to N.J.S.A. 54A:2-1:

> Imposition of tax. 54A:2-1. Imposition of tax. There is hereby imposed a tax for each taxable year (which shall be the same as the taxable year for federal income tax purposes) on the New Jersey gross income as herein defined of every individual, estate or trust (other than a charitable trust or a trust forming part of a pension or profit-sharing plan), subject to the deductions, limitations and modifications hereinafter provided, determined in accordance with the following tables with respect to taxpayers' taxable income:
>
> a. For married individuals filing a joint return and individuals filing as head of household or as surviving spouse for federal income tax purposes:
>
> . . .
>
> (6) for taxable years beginning on or after January 1, 2018:
>
> If the taxable income is:        The tax is:
>
> . . .
>
> Over $5,000,000.00    $431,457.50 plus 10.75% of the excess over $5,000,000.00.

On July 1, 2018, Governor Murphy's proposed amendments to A. 3088 passed the New Jersey State Assembly and the New Jersey State Senate. On July 1, 2018, Governor Murphy signed A. 3088 into law. However, of particular significance in this matter, A. 3088 as enacted, provided that "[t]his act shall take effect immediately and shall apply to taxable years beginning on and after January 1, 2018. . . ." Thus, capturing the approximate $316,388,583 in capital gains generated by plaintiffs sale of the equity interests they owned in Ferraro Foods, Inc.

On or about October 15, 2019, plaintiffs filed their 2018 NJ-1040, New Jersey Resident Income Tax Return, reporting a net gain or income from the disposition of property of $309,888,583. Plaintiffs remitted the 10.75% tax on their New Jersey Gross Income.






On or about October 7, 2020, plaintiffs filed a 2018 NJ-1040X, New Jersey Amended Resident Income Tax Return ("2018 Amended Return"), seeking a "$5,518,184 refund based upon the retroactive application of a 10.75% rate to [p]laintiffs' income in excess of $5 million." Plaintiffs' complaint asserts that they seek a refund of "the difference in tax (plus interest) between the 8.97% tax rate that was in effect at the time of the [May 8, 2018] [t]ransactions and the 10.75% tax rate that became law after the [t]ransactions but applied retroactively."

On or about June 30, 2021, the defendant issued a Statement of Account denying plaintiffs' refund claim. Thereafter, on September 16, 2021, the defendant issued a notice to plaintiffs upholding its prior denial determination. Plaintiffs filed a protest with the defendant's Conference and Appeals Branch, and on November 30, 2023, the defendant issued a Final Determination letter denying plaintiffs' 2018 New Jersey Gross Income Tax refund claim.

In support of its motion to quash, the OOTG argues that the documents, information, and testimony sought under the Subpoena are "confidential and not subject to disclosure pursuant to the deliberative process privilege and/or the executive privilege," and/or attorney/client privilege. More specifically, the OOTG contends that these documents amount to "pre-decisional communications, discussions and internal statements . . . represent[ing] candid discussions and recommendations regarding the State's taxpayers and the ability of the State to collect revenue for important government functions." The OOTG emphasizes that the confidentiality of these records is critical "because candor and the ability to have open discussions are both essential to ensuring that the state is able to fund important government functions."

Moreover, the OOTG further asserts that the Subpoena must be quashed because it is overbroad. OOTG emphasizes that plaintiffs' complaint raises claims of manifest injustice, denial of due process and equal protection, stemming from the retroactive application of the amendments






to N.J.S.A. 54A:2-1. Thus, the OOTG contends that the Subpoena seeks documents that are "overly broad" from a non-party to this action that are "speculative" and "'not essential to the perfection' of their case" and which "will not provide or disprove [p]laintiffs' allegations."

**II. Conclusions of Law**

A. Relevance/Motions to Quash

Our courts apply a standard of substantial liberality in providing access to information, documents and materials, favoring litigants' rights to "broad pretrial discovery." Payton v. New Jersey Turnpike Authority, 148 N.J. 524, 535 (1996) (citing Jenkins v. Rainner 69 N.J. 50, 56 (1976)). See also Shanley & Fisher, P.C. v. Sisselman, 215 N.J. Super. 200, 215-216 (App. Div. 1987). In general, a party may obtain material which "appears reasonably calculated to lead to the discovery of admissible evidence" pertaining to the cause of action. In re: Liquidation of Integrity Ins. Co., 165 N.J. 75, 82 (2000). The court rules afford litigants the right to "obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action. . ." R. 4:10-2(a).

While not explicitly defined under our court rules, "relevant evidence" is defined as "evidence having any tendency in reason to prove or disprove any fact of consequence to the determination of the action." N.J.R.E. 401. However, the relevancy of documents and materials is not predicated upon their admissibility at trial; instead, it is founded upon whether the information sought is "reasonably calculated to lead to admissible evidence respecting the cause of action or its defense." Pressler & Verniero, Current New Jersey Rules Governing the Courts, comment 1 on R. 4:10-2(a) (2025). Thus, disclosure of inadmissible evidence is nonetheless required "if the information sought appears reasonably calculated to lead to the discovery of admissible evidence." R. 4:10-2(a). See also Irval Realty Inc. v. Board of Public Utility






Commissioners, 115 N.J. Super. 338, 346 (App. Div. 1971), aff'd, 61 N.J. 366 (1972); Berrie v. Berrie, 188 N.J. Super. 274, 278 (Ch. Div. 1983).  Information which bears even a remote relevance to the subject matter of a cause of action is discoverable, if it is reasonably likely to lead to discovery of admissible evidence.

Although pretrial discovery should be liberally granted, its reach is not without limits. Meandering expeditions which seek privileged, irrelevant, duplicative, oppressive or burdensome information are not permitted.  "The discovery rights provided by our court rules are not instruments with which to annoy, harass or burden a litigant or a litigant's experts."  Gensollen v. Pareja, 416 N.J. Super. 585, 591 (App. Div. 2010).  See also Piniero v. N.J. Div. of State Police, 404 N.J. Super. 194, 204 (App. Div. 2008).  Moreover, the use of subpoenas to obtain pre-trial discovery materials is subject to the protections afforded under R. 1:9-2 and R. 4:10-3.  See R. 4:14-7(a).

R. 1:9-2 permits the court "on motion made promptly [to] quash or modify the subpoena . . . if compliance would be unreasonable or oppressive and . . . may condition denial of the motion upon the advancement by the person in whose behalf the subpoena or notice is issued of the reasonable cost of producing the objects subpoenaed."  R. 1:9-2. See also In re: Grand Jury Proceedings of Guarino, 104 N.J. 218 (1986); In re Addonizio, 53 N.J. 107 (1968); In re Grand Jury Subpoenas Duces Tecum Served by Sussex Cty., 241 N.J. Super. 18 (App. Div. 1989).  These "principles that guide our courts in pretrial discovery matters . . . strive to avoid placing undue burdens upon litigants or imposing unfair conditions upon access to relevant information or potential witnesses."  In re Pelvic Mesh/Gynecare Litigation, 426 N.J. Super. 167, 196 (App. Div. 2012).

The Subpoena seeks documents from the OOTG related to Governor Murphy's veto of A.






3088 and proposal modifying A. 3088 by amending N.J.S.A. 54A:2-1(a)(6).[4]  In their complaint, plaintiffs charge that the "10.75% tax rate set forth in N.J.S.A. 54A:2-1(a)(6) enacted on July 1, 2018 [under A. 3088] cannot be applied retroactively" to the sale of their interest in Ferraro Foods, Inc. occurring on May 8, 2018.  Plaintiffs argue that A. 3088's retroactive application to January 1, 2018 is manifestly unjust, discriminatory and violates their due process and equal protection rights under the New Jersey Constitution and the United States Constitution.

Therefore, the court's consideration of relevancy must be measured against whether the documents and materials sought under the Subpoena have a reasonable likelihood of proving or disproving any fact of consequence under plaintiffs' manifest injustice and constitutional claims.

In applying the doctrine of manifest injustice, the court's inquiry does not necessarily rise to constitutional considerations, rather the court's decision "look[s] to matters of unfairness and inequity." In re D.C., 146 N.J. 31, 58 (1996).  Embodied in this analysis is the taxpayers "reliance on existing law . . . and the unfairness of changing that law. . . ." Ibid.  In evaluating these factors, the trial court "must weigh 'the public interest in the retroactive application of the statute against the affected party's reliance on previous law, and the consequences of that reliance.'" Oberhand v. Dir., Div. of Taxation, 193 N.J. 558, 572 (2008) (quoting Nelson v. Bd. of Educ. of Old Bridge, 148 N.J. 358, 372 (1997)).

Here, it is undisputed that Governor Murphy's veto of A. 3088 proposed specific modifications and amendments to N.J.S.A. 54A:2-1(a)(6) by increasing the income tax rate, from 8.97% to 10.75%, on individuals having annual gross income exceeding $5,000,000.  Thus,

---

[4]  The Subpoena also seeks documents related to the enactment of S. 2019.  S. 2019 is the New Jersey Senate's Appropriations Bill for fiscal year 2019.  Under our State's Constitution, the "power and authority to appropriate funds lie solely and exclusively with the legislative branch of government." Camden v. Byrne, 82 N.J. 133, 148 (1980); see N.J. Const., Art. VIII, § II, par. 2.






consideration by the court of plaintiffs' manifest injustice claims would require not only credible evidence of plaintiffs' reliance on the former N.J.S.A. 54A:2-1(a), but evidence of the public interest in the retroactive application of A. 3088. Accordingly, there is a "logical connection" or likelihood that the documents and information sought under the Subpoena may be probative of a fact of consequence in this matter. State v. Hutchins, 241 N.J. Super. 353, 358 (App. Div. 1990). Therefore, the court finds that the materials sought under the Subpoena with respect to A. 3088 are relevant, or reasonably likely to lead to the discovery of admissible evidence in this matter under R. 4:10-2(a).[5] [6]

Despite their relevance, the documents may nonetheless remain confidential if the OOTG can demonstrate by a preponderance of the evidence that a recognized privilege applies. "Although relevance creates a presumption of discoverability, confidentiality may be maintained if an evidentiary privilege exists." In re Liquidation of Integrity Ins. Co., 165 N.J. at 83 (citing Payton, 148 N.J. at 539).

---

[5] The court does not find that the manner which revenue is proposed to be allocated by our Legislature under S. 2019, for the 2019 fiscal year, in support of the performance of its government functions, is relevant to this matter and reasonably likely to lead to the discovery of admissible evidence under R. 4:10-2(a). Thus, the court grants the OOTG's motion to quash with respect to documents or information sought under the Subpoena related to S. 2019.

[6] Analyzing plaintiffs due process allegations against these metrics leads the court to conclude that the documents and information sought under the Subpoena are also relevant. The retroactive application of a statute "does not deprive parties of due process if the legislation 'is supported by a legitimate legislative purpose furthered by rational means.'" Nobrega v. Edison Glen Assocs., 167 N.J. 520, 542-43 (2001). However, the burden of demonstrating that the legislative action was arbitrary and irrational is shouldered by the party alleging the due process violation. See Usery v. Turner Elkhorn Mining Co., 428 U.S. 1, 15 (1976). This invokes the rational basis test and requires consideration of whether the statute "is supported by a legitimate legislative purpose furthered by rational means." Pension Benefit Guaranty Corp. v. R.A. Gray & Co., 467 U.S. 717, 729 (1984). Importantly, the rational basis test requires the court to "answer two questions: (1) Does the challenged legislation have a legitimate purpose? and (2) Was it reasonable for the lawmakers to believe that use of the challenged classification would promote that purpose?" W. & S. Life Ins. Co. v. State Bd. of Equalization, 451 U.S. 648, 668 (1981).






B.    Privilege

When a party seeks to withhold materials that it asserts are privileged or protected, "the party shall make the claim expressly and shall describe the nature of the documents, communications, or things not produced or disclosed in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the applicability of the privilege or protection."  R. 4:10-2(e)(1).

"A privilege reflects a societal judgment that the need for confidentiality outweighs the need for disclosure."  Payton, 148 N.J. at 539 (citing Hague v. Williams, 37 N.J. 328 (1962)). However, our Supreme Court has cautioned that the mere assertion of a privilege does not ensure confidentiality of the information over which a privilege has been asserted.  Although a presumption of relevancy attaches to discovery material sought, the person attempting to overcome the presumption of relevancy:

> must establish by a preponderance of the evidence that the interest in secrecy outweighs the presumption.  The need for secrecy must be demonstrated with specificity as to each document.  Broad allegations of harm, unsubstantiated by specific examples or articulated reasoning, are insufficient.
>
> [Hammock by Hammock v. Hoffman-LaRoche, 142 N.J. 356, 381-382 (1995) (emphasis added).]

Thus, the party which seeks to maintain the confidentiality of information must demonstrate with relative precision, the necessity for secrecy with respect to each document over which it has been asserted.  General allegations of harm or injury are insufficient.  Our courts disfavor a blanket approach to preserving the secrecy of certain types of information and instead have adopted a "case-by-case balancing" approach.  Payton, 148 N.J. at 539.  Hence, although relevancy creates "a presumption of discoverability, that presumption can be overcome" by the






party asserting the privilege by demonstrating through "a preponderance of the evidence that the interest in secrecy outweighs the presumption." Payton, 148 N.J. at 539 (quoting Hammock, 142 N.J. at 381).

Moreover, New Jersey has adhered to a public policy favoring open government and access to governmental records.[7] Our Legislature and judicial system have advanced a "tradition of 'openness and hostility to secrecy in government.'" Kuehne Chemical Co., Inc. v. North Jersey Dist. Water Supply Comm'n, 300 N.J. Super. 433, 438 (App. Div. 1997) (quoting North Jersey Newspapers Co. v. Passaic Cty. Bd. of Chosen Freeholders, 127 N.J. 9, 16 (1992)). New Jersey public policy favors "access to sufficient information to enable the public to understand and evaluate the reasonableness of the public body's action." South Jersey Publishing Co., Inc. v. New Jersey Expressway Auth., 124 N.J. 478, 494-495 (1991). Nonetheless, the public's right to openness, access, and inspection is not infinite.

Our courts have recognized that a "government record may be excluded from disclosure

---

[7] The Open Public Records Act, N.J.S.A. 47:1A-1 to -4 ("OPRA") broadly defines the term "government record" as:

> any paper, written or printed book, document, drawing, map, plan, photograph, microfilm, data processed or image processed document, information stored or maintained electronically or by sound-recording or in a similar device, or any copy thereof, that has been made, maintained or kept on file in the course of his or its official business by any officer, commission, agency or authority of the State or of any political subdivision thereof, including subordinate boards thereof, or that has been received in the course of his or its official business by any such officer, commission, agency, or authority of the State or of any political subdivision thereof, including subordinate boards thereof. The terms shall not include inter-agency or intra-agency advisory, consultative, or deliberative material.
>
> [N.J.S.A. 47:1A-1.1.]






by other statutory provisions or executive orders or exempt from disclosure due to a recognized privilege or grant of confidentiality established in or recognized by the State Constitution, statute, court rule, or judicial decision." O'Boyle v. Borough of Longport, 218 N.J. 168, 185 (2014) (citations omitted). Thus, despite public policy interests which favor broad access to governmental records, both our Legislature and courts have recognized that certain government records may be shielded from production when a recognized privilege has been adequately demonstrated. See South Jersey Publishing Co., Inc. v. N.J. Expressway Auth., 124 N.J. 478 (1991); Pillsbury v. Monmouth Cty. Freeholders, 133 N.J. Super. 526 (Law Div. 1975), aff'd, 140 N.J. Super. 410 (App. Div. 1976); Accident Index Bureau, Inc. v. Hughes, 83 N.J. Super. 293 (App. Div. 1964), aff'd, 46 N.J. 160 (1965); Press of Atlantic City v. Ocean Cty. Joint Ins. Fund, 337 N.J. Super. 490 (Law. Div. 2000). Importantly, in conducting its analysis, the trial court must "examine each document individually and make factual findings with regard to why interest in disclosure is or is not outweighed by [the State's] interest in nondisclosure." Keddie v. Rutgers, 148 N.J. 36, 54 (1997).

It is against this backdrop that the OOTG seeks entry of an order quashing the Subpoena. Although the OOTG acknowledges the strong presumption in favor of affording access to discovery, it emphasizes that when a recognized privilege, exemption, or grant of confidentiality has been recognized by our statutes, court rules, or case law, the information is exempt from disclosure. In short, the OOTG argues that the confidentiality of the documents sought under the Subpoena must be maintained because they are protected under the deliberative-process, executive, and attorney-client privileges.

Plaintiffs contend that the Subpoena is "narrowly tailored" to elicit "information relating to the retroactive application" of A. 3088 and for "information . . . relating to estimates that the






increase in the marginal tax rate . . . would yield additional gross income tax revenue . . . by applying the Amendment retroactively." Notably, plaintiffs assert that "[t]here is simply no other way for [p]laintiffs to obtain this highly relevant information concerning the . . . decision to apply the Amendment retroactively."

      1.     <u>Deliberative-process and executive privileges</u>

The deliberative-process privilege "permits the government to withhold documents that reflect advisory opinions, recommendations, and deliberations comprising part of a process by which governmental decisions and policies are formulated." <u>In re Liquidation of Integrity Ins. Co.</u>, 165 N.J. at 83 (citing <u>NLRB v. Sears, Roebuck & Co.</u>, 421 U.S. 132, 150 (1975)).

The parallel, but more narrowly tailored, executive privilege affords the "Governor, as chief executive, . . . a qualified power to protect the confidentiality of communications pertaining to the executive function. This power is analogous to the qualified constitutionally-based privilege of the President, which is 'fundamental to the operation of government and inextricably rooted in the separation of powers. . . .'" <u>Nero v. Hyland</u>, 76 N.J. 213, 225 (1978) (quoting <u>United States v. Nixon</u>, 418 U.S. 683, 708 (1974)). Thus, the executive privilege stems from the recognition that "[a] vital public interest is clearly involved in the effectiveness of the decision-making . . . duties of the executive." <u>Id.</u> at 226.

Our courts have recognized that the executive privilege will extend to:

> a variety of communications between the chief executive and third parties and that the information exchanged need not be in the nature of formal advice to garner the protection afforded by the privilege. In fact, these cases instruct us that the chief executive should be able to receive a broad range of information from diverse sources to discharge the executive function. A broad executive communications privilege applies to documents in their entirety, covering 'final and post-decisional materials as well as pre-deliberative ones.' In that regard, although the privilege is based on






the need to preserve the executive's 'access to candid advice,' it does not encompass 'only the deliberative or advice portions of documents.'

[Wilson v. Brown, 404 N.J. Super. 557, 576 (App. Div. 2009) (quoting In re Sealed Case, 121 F.3d 729, 745 (D.C. Cir. 1997)).]

The impetus for the deliberative process and executive privileges arise from the view that:

Free and open comments on the advantages and disadvantages of a proposed course of governmental management would be adversely affected if the civil servant or executive assistant were compelled by publicity to bear the blame for errors or bad judgment properly chargeable to the responsible individual with power to decide and act. Government from its nature has necessarily been granted a certain freedom from control beyond that given the citizen. It is true that it now submits itself to suit but it must retain privileges for the good all.

There is a policy involved in this claim of privilege for this advisory opinion-the policy of open, frank discussion between subordinate and chief concerning administrative action.

[Kaiser Alum. & Chem. Corp. v. United States, 157 F. Supp. 939, 945-946 (U.S. Ct. Cl. 1958).]

In sum, these privileges attach to government records "which contain[] or involve[] factual components, . . . when it was used in the decision-making process and its disclosure would reveal deliberations that occurred during that process." Educ. Law Ctr. v. N.J. Dept of Educ., 198 N.J. 274, 280 (2009).

However, for the deliberative process or executive privileges to apply, the materials must satisfy two threshold requirements. First, the materials must be "pre-decisional" or "generated before the adoption of an agency's policy or decision." In re Liquidation of Integrity Ins. Co., 165 N.J. at 84-85 (citing Coastal States Gas Corp. v. Department of Energy, 199 U.S. App. D.C. 272 (D.C. Cir. 1980)). Notably, a document that contains "numerical or statistical data or information used in the development of, or deliberation on, a possible governmental course of action,"

   

constitutes pre-decisional material. <u>Educ. Law Ctr.</u>, 198 N.J. at 295. In stark contrast, "[p]urely factual material that does not reflect deliberative processes in any way is not protected by the privilege." <u>Ciesla v. N.J. Dep't of Health and Senior Servs.</u>, 429 N.J. Super. 127, 138 (App. Div. 2012).

Second, the materials must be "deliberative in nature, containing opinions, recommendations, or advice about agency policies." <u>Ibid.</u> However, "[d]eliberative material need not, in all instances, expressly reflect an overt opinion, recommendation, or advice when a discretionary decision is in development." <u>Educ. Law Ctr.</u>, 198 N.J. at 295. Thus, in gauging whether the deliberative process privilege is applicable, the court must "assess such fact-based documents against the backdrop of an agency's deliberative efforts in order to determine a document's nexus to that process and its capacity to expose the agency's deliberative processes." <u>Id.</u> at 280.

Critically, when asserting that documents or materials should remain confidential under the deliberative process and executive privileges, "[t]he initial burden falls on the state agency to show that the documents it seeks to shield are pre-decisional and deliberative in nature (containing opinions, recommendations, or advice about agency policies)." <u>In re Liquidation of Integrity Ins. Co.</u>, 165 N.J. at 88. After the government agency has conclusively proven that the materials are deliberative, "a presumption against disclosure" will attach. <u>Ibid.</u> Accordingly, the burden then shifts to the party seeking the materials to demonstrate that their "compelling or substantial need for the materials overrides the government's interest in non-disclosure. Among the considerations for the court are the importance of the evidence to the movant, its availability from other sources, and the effect of disclosure on frank and independent discussion of contemplated government policies." <u>Ibid.</u> Thus, when a litigant's "need for the materials and the need for accurate fact-






finding override the government's significant interest in non-disclosure," production may be nonetheless required. Id. at 85 (citing FTC v. Warner Communications, Inc., 742 F.2d 1156, 1161 (9th Cir. 1984)).

In resolving whether a litigant has demonstrated an overriding need for the materials, the trial court should consider the following criteria: "'(1) the relevance of the evidence; (2) the availability of other evidence; (3) the government's role in the litigation; and (4) the extent to which disclosure would hinder frank and independent discussion regarding contemplated policies and decisions.'" Educ. Law Ctr., 198 N.J. at 287 (quoting In re Liquidation of Integrity Ins. Co., 165 N.J. at 85-86). Importantly, our courts have recognized that there is a "qualitative difference in the nature of information that an investigative agency acquires." McClain v. Coll. Hosp., 99 N.J. 346, 361 (1985). Thus, when the inquiry focuses on law enforcement investigatory information, the situation "invites case-by-case consideration of whether access would probably so prejudice the possibility of effective law enforcement that such disclosure would not be in the public interest." Id. at 357.

2. Attorney-client privilege

"The attorney-client privilege is a recognized privilege that may shield documents that otherwise meet the OPRA definition of government record from inspection or production." O'Boyle, 218 N.J. at 185. See also K.L. v. Evesham Twp. Bd. of Educ., 423 N.J. Super. 337, 352-53 (App. Div. 2011); Gannett N.J. Partners, L.P. v. Cty. of Middlesex, 379 N.J. Super. 205, 218, (App. Div. 2005). The "privilege has been codified in New Jersey, by both statute and rule, the terms of which are identical." Paff v. Div. of Law, 412 N.J. Super. 140, 150 (App. Div. 2010). The rationale underlying the "'privilege is to promote full and free discussion between a client [and his] attorney . . . [I]t is essential that a client be able to protect his discussions with his attorney






from disclosure.'" Macey v. Rollins Envtl. Servs. (N.J.), Inc., 179 N.J. Super. 535, 539 (App. Div. 1981) (quoting Fisher v. United States, 425 U.S. 391, 403 (1976)).

For the privilege to apply, "a party must show that there was a confidential communication 'between [a] lawyer and [their] client in the course of that relationship and in professional confidence[.]'" Tractenberg v. W. Orange Twp., 416 N.J. Super. 354, 375 (App. Div. 2010) (quoting N.J.R.E. 504(1)). Thus, for the privilege to attach, three criteria must be met: (i) an attorney-client relationship must exist; (ii) the communication must be made during the professional relationship; and (iii) there must be an expectation that the communication will remain confidential. See N.J.S.A. 2A:84A-20; N.J.R.E. 504. Importantly, the privilege will not apply if the communication was knowingly made within the hearing of an individual whose presence nullifies the privilege. N.J.R.E. 504(3). Stated differently, the privilege extends protection only to those communications expected or intended to be confidential. Coyle v. Estate of Simon, 247 N.J. Super. 277, 282 (App. Div. 1991).

Moreover, the attorney-client "privilege is fully applicable to communications between a public body and an attorney retained to represent it." Paff, 412 N.J. Super. at 152 (quoting In re Grand Jury Subpoenas Duces Tecum Served by Sussex Cty., 241 N.J. Super. at 28). The "privilege also extends to consultations with third parties whose presence and advice are necessary to the legal representation." O'Boyle, 218 N.J. at 185 (citing State v. Davis, 116 N.J. 341, 361 (1989)); see also Tractenberg, 416 N.J. Super. at 376; State v. Kociolek, 23 N.J. 400, 413 (1957)). "Such 'necessary intermediaries' have been held to include a psychiatrist retained by defense counsel, arson experts hired by defense counsel, a handwriting expert employed by defense counsel, and an engineering firm hired as a consultant for litigation assistance." Tractenberg, 416 N.J. Super. at 376 (internal citations omitted).

   

### 3.   Court analysis

Here, it is undisputed that the Subpoena was served on Kate McDonnell, Chief Counsel to the Governor, seeking documents or testimony from the OOTG pertaining to A. 3088.  Thus, the Subpoena seeks information from the executive branch of our state's government and potentially from legal counsel to the executive branch.  Accordingly, both the deliberative process/executive privilege and attorney-client privilege may be implicated.

However, to enable the court to gauge the appropriateness of applying the deliberative process/executive privilege to the documents or testimony being sought, the materials must be "pre-decisional" or "generated before the adoption of an agency's policy or decision." In re Liquidation of Integrity Ins. Co., 165 N.J. at 84-85 (citing Coastal States Gas Corp. v. Dept. of Energy, 199 U.S. App. D.C. 272 (D.C. Cir. 1980)).  Additionally, the materials must be "deliberative in nature, containing opinions, recommendations, or advice about agency policies." Ciesla, 429 N.J. Super. at 138.  Thus, the burden falls squarely on the OOTG to demonstrate that the documents sought under the Subpoena are both pre-decisional and deliberative. See In re Liquidation of Integrity Ins. Co., 165 N.J. at 88.

However, the OOTG has not furnished the court with a journal or certification detailing the date range of any of the alleged 55,000 documents.  Thus, the court cannot ascertain whether all the documents identified can be accurately classified as "pre-decisional."  Additionally, the OOTG has not provided the court with a privilege log categorizing the documents by type, sender, date, recipient, and a general summary or description of their purpose or contents to enable the court to make an informed decision regarding whether they are deliberative in nature, containing advice, opinions, or recommendations about pending legislation or the advancement of public policies.






Rather, in support of its motion, the OOTG offers only the certification of Valentina DiPippo, the Custodian of Government Records for the OOTG revealing that:

> [w]ith respect to documents, communications, internal memorandum, and/or statements that refer or relate to Assembly Bill No. 3088 ("A3088"), N.J.S.A. § 54A:2-1, and the Executive Branch's Fiscal Analysis in the Legislative Fiscal Estimate as requested by the Subpoena's second, third, fourth, fifth, sixth, seventh, eighth, ninth, tenth, and eleventh requests, an Office-wide email search revealed that there are over 55,000 search hits that refer or relate to A. 3088, N.J.S.A. § 54A:2-1, or to the 'Millionaire's Tax.' These are raw search results that have not been reviewed or deduplicated.

Thus, the certification of Ms. DiPippo offers no meaningful insight to the court to allow it to make an informed and detailed finding that all or any portion of the documents revealed under the search were "pre-decisional" or deliberative and generated by employees or representatives of the OOTG related to the adoption of a policy or decision regarding A. 3088.

Moreover, for the attorney-client privilege to attach to any of the documents sought under the Subpoena, the OOTG must demonstrate that an attorney-client relationship exists; the communication was made during the professional relationship; and an expectation arose that the communication will remain confidential. In sum, "that there was a confidential communication 'between [a] lawyer and [their] client in the course of that relationship and in professional confidence[.]'" Tractenberg, 416 N.J. Super. at 375.

Here, although the Subpoena was served on Kate McDonnell, Counsel for the Governor, it was done so in her capacity as the governor's legal representative. The fact that the Subpoena was addressed to the governor's counsel does not establish that an attorney-client relationship existed with respect to all the information sought under the Subpoena. The certification of Ms. DiPippo, who serves as Custodian of Government Records for the OOTG, reveals that an "Office-wide"






search of records maintained by the Office of the Governor was conducted. Thus, the document search may have yielded documents that were prepared by individuals where no attorney-client relationship existed. However, because the OOTG has not provided the court with a privilege log identifying the preparer or purpose of any of the alleged 55,000 identified documents, the court is unable to conclusively determine if any of the documents meet the attorney-client privilege.

Our courts have consistently recognized the salutary principal that when a privilege has been asserted, "[t]he need for secrecy must be demonstrated with specificity as to each document." Hammock by Hammock, 142 N.J. at 382. Thus, the moving party bears the burden of proving that the privilege applies. Here, the court finds that the OOTG has met this burden. The OOTG has not proven, by any measure of specificity, that any of the alleged 55,000 documents must be protected under the deliberative process/executive privilege or attorney-client privilege.

### III. Conclusion

Accordingly, for the above-stated reasons, the OOTG's motion to quash the Subpoena is denied, in part, and granted, in part, without prejudice. The motion to quash is denied insofar that the Subpoena seeks documents, information, or testimony involving A. 3088. The motion to quash is granted insofar that the Subpoena seeks documents, information, or testimony involving S. 2019.

However, the court will afford the OOTG until Monday, October 6, 2025 to respond to the Subpoena, as modified hereinabove. If after conducting a more thorough review and analysis of the documents and materials in their possession responsive to the Subpoena, the OOTG is able to furnish a log or journal categorizing, classifying, or detailing for the court why certain groups or categories of the documents and information are "pre-decisional" and were generated in anticipation of a policy or decision by the Governor's office with respect to A. 3088, or were subject to the attorney-client privilege, then the OOTG may refile its motion to quash the Subpoena






with respect to those documents or materials.


Very truly yours,



Hon. Joshua D. Novin, J.T.C.




